**Alan F. GERSMAN, et al., Plaintiffs,**

v.

**GROUP HEALTH ASSOCIATION, INC., Defendant.**

**Civ. A. No. 88–1820.**

United States District Court, District of Columbia.

Nov. 13, 1989.

David H. Shapiro, Kator, Scott & Heller, Washington, D.C., for plaintiffs.

Anita Barondes, Robert Shea, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

REVERCOMB, District Judge.

Plaintiffs Computer Security International, Inc. (CSI) and Alan F. Gersman claim that the Defendant Group Health Association, Inc. violated the District of Columbia Human Rights Act (DCHRA), D.C. Code § 1-2501 *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, by terminating a contract with Plaintiff CSI solely because Plaintiff Gersman, the president and principal stockholder of Plaintiff CSI, is Jewish. This matter is before the Court pursuant to Defendant's motion to dismiss Plaintiffs' complaint for failure to state a claim and because neither Plaintiff has standing to bring this action. FED.R.CIV.P. 12(b)(6).

### A. Statement of Facts

For purposes of a Rule 12(b)(6) motion to dismiss this Court must accept all well-pleaded facts in the Plaintiffs' complaint as true. *Stewart v. District of Columbia Armory Bd.*, 863 F.2d 1013, 1014 (D.C.Cir. 1988). Plaintiff CSI and Defendant entered into a contract with each other in August 1983 whereby Plaintiff CSI agreed to store Defendant's computer software generated in the course of its business. The contract provided for a one-year term with automatic renewal for successive one-month periods until either Party provided thirty-days notice of termination.[1] The contract further provided that "[f]or renewal terms, notice of adjustment in the fixed charges shall be supplied in writing not less than forty-five (45) days prior to the renewal date at which the charges will take effect." The agreement remained in effect between the Parties as they had originally contemplated until Defendant terminated it in November 1987.

In the latter part of 1986 Mr. Mohammad Ghafori became the operations manager of Defendant's Management Operations System. In August 1987, Mr. Adel Nakhla, an assistant to Mr. Ghafori, met with Plaintiff Gersman and asked him, under the direction of Mr. Ghafori, if Plaintiff Gersman were Jewish to which he answered yes. Prior to the above incident Defendant had consistently expressed its satisfaction with Plaintiff CSI's services but after the incident Plaintiff Gersman began hearing rumors that Defendant was dissatisfied. Plaintiff Gersman approached the highest level managers of Defendant who, while admitting that the inquiry about Plaintiff Gersman's heritage had occurred, did not take measures to rectify the situation. On October 6th, 1987, one of Defendant's employees, under the direction of Mr. Ghafori, refused to renew Defendant's contract with Plaintiff CSI.

### B. Section 1981

■ Count II of Plaintiffs' complaint alleges that the Defendant violated § 1981 "by abridging plaintiffs the rights to make and enforce contracts" because Plaintiff Gersman is Jewish.[2] This Court rules that

---

1. The contract provided:

The initial term of this agreement shall be for *1 year* month(s). After expiration of the initial term, this agreement shall automatically renew for successive one month periods until terminated by either party upon receipt of written notice thirty days before the end of these successive periods.

2. Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be

Plaintiffs have failed to state a claim under section 1981 in light of the Supreme Court's recent decision in *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

In *Patterson,* an employee alleged that her employer had harassed and failed to promote her on the basis of race in abridgment of her right to make and enforce contracts. The Court held that the employee did not have a cause of action on the basis of the alleged harassment under § 1981 because the contracts clause applied only to the formation of contracts and the enforcement of contracts through the legal process. The employer's alleged harassment constituted "postformation conduct ... relating to the terms and conditions of continuing employment," *id.* 109 S.Ct. at 2374, which was not within the scope of § 1981:

> [T]he right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment. ...

*Id.* at 2373.

In regard to the employer's alleged failure to promote the employee on the ground of race the Court recognized that in some instances an employer's failure to promote an employee could constitute a refusal to enter into a new contract but cautioned that "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981." *Id.* at 2377.

In the instant case, the Defendant argues that it simply terminated an existing contract with Plaintiff CSI and that its action accordingly constitutes postformation conduct not within the scope of § 1981. The Plaintiffs, on the other hand, contend that the original contract terminated on its own terms after one year and that the Parties subsequently entered into a series of new contracts for one-month terms. Accordingly, the Plaintiffs characterize the Defendant's failure to renew the contract not as a termination of an existing contract but as a refusal to enter into a new contract.

The provision that the contract would be automatically renewed at the end of one year for successive one-month periods unless either Party affirmatively terminated the contract was a result of the negotiations of the Parties in the first instance. It is illogical to argue that when the automatic renewal provision took effect within the original contemplation of the Parties new and distinct contracts were created. These automatic renewals occurred *precisely because* they were provided for in the contract formed in 1983. The decision of the Defendant to terminate the contract was premised upon and consistent with the terms of the 1983 contract and accordingly constitutes postformation conduct.

The Plaintiffs further contend that each one-month term constituted a new contract because either Party could upon proper notice renegotiate the price term for any given one-month term. The Plaintiffs contend that since the price term is fundamental to a contract then any opportunity for renegotiation of price necessarily "rises to the level of an opportunity for a new and distinct relation" between the Parties. Again, however, this provision for price renegotiation is precisely a term of the original contract upon which the Parties would necessarily have to rely in order to effectuate a change in the price term.

Even if this Court were to accept Plaintiffs' position that the automatic one-month renewals and opportunities to renegotiate the price term result in new and distinct contracts, this Court understands *Patterson* to require more than merely a formal

subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to

no other.

change in the relationship between the Parties premised on state contract law. *See Patterson*, 109 S.Ct. at 2375–76 (the substantive content of § 1981 is clearly independent of the terms of any particular contract and of state contract law). Where the Supreme Court held in *Patterson* that the employer's failure to promote an employee could *in some instances* constitute a failure to make a contract it necessarily was contemplating that the promotion would provide a fundamental and significant change in the status of the employee with the employer; otherwise, the Supreme Court would have held more categorically that *any* failure to promote the employee would constitute a claim under § 1981. To accept Plaintiffs' position that any opportunity to renegotiate price term constitutes a new contract would be an unreal view of the continuing relationship between the Parties where the only term which was subject to renegotiation was price and the duties and rights of the Parties otherwise remained constant. The Court in *Patterson* has directed that a "lower court should give a fair and natural reading to the statutory phrase 'the same right … to make … contracts,' and should not strain in an undue manner the language of § 1981." 109 S.Ct. at 2377. The Supreme Court's direction is well-heeded in the instant case.

### C. DCHRA

■ The Plaintiffs concede that the Defendant's termination of its contract with Plaintiff CSI for discriminatory reasons is not covered under any of the specifically cited prohibitions in § 1–2511 of the DCHRA but contend that the D.C. Council did not intend those specific prohibitions to be an exhaustive list. Rather, the Plaintiffs claim, the DCHRA covers any conduct which deprives individuals of their "rights to be free from discrimination in their participation in the economic life of the District of Columbia." *Plaintiffs' Complaint* ¶ 20. Plaintiffs have cited no caselaw to support their position and both Parties agree that the issue—whether conduct which is not specifically enumerated under the DCHRA can nonetheless be prohibited if a court finds that the conduct impinges

upon an individual's equal right to fully participate in the "economic life" of the District of Columbia—is one of first impression.

Section 1–2511 provides:

Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing and commercial space accommodations.

Although the "including, but not limited to" language of this section at first blush suggests that the enumerated prohibitions are not exclusive under the DCHRA, this Court finds that when the sections of the statute are analyzed not in isolation but as they relate to each other it is manifestly clear that the D.C. Council was legislating only against the discriminatory conduct specifically enumerated in § 1–2511.

Under the doctrine of *ejusdem generis* specific language governs over general language. *See Vann v. District of Columbia Bd. of Funeral Directors and Embalmers*, 480 A.2d 688, 695 (D.C.1984). This doctrine is all the more compelling when § 1–2511 is read in relationship to the other sections within Subchapter II of the DCHRA entitled *Prohibited Acts of Discrimination*. For every enumerated prohibition in § 1–2511 the D.C. Council specifically enacted in subsequent sections detailed legislation on that prohibited conduct. In separate and distinct sections following § 1–2511 the DCHRA prohibits discrimination in employment, § 1–2512, real estate transactions, §§ 1–2515, 1–2516, 1–2517, public accommodations, § 1–2519, educational institutions, § 1–2520, and the sale of motor vehicle insurance. § 1–2533. Thus, the D.C. Council specifically was aware of specific conduct that it wanted to prohibit in § 1–2511 and provided subsequent sections to cover that conduct while providing no legislation on what constitutes conduct that would otherwise be prohibited under the general rubric of "economic

life." *See Vann v. Bd. of Funeral Directors and Embalmers*, 480 A.2d at 695 (general language of introduction refers only to conduct as listed in subsequent subsections of the statute); *see also Air Transp. Ass'n v. Federal Energy Office*, 382 F.Supp. 437, 445 (D.D.C.1974), *aff'd*, 520 F.2d 1339 (Temp.Emer.Ct.App.1975); *Bissette v. Colonial Mortgage Corp.*, 477 F.2d 1245, 1246 n. 2 (D.C.Cir.1973); *accord Council of Hawaii Hotels v. Agsalud*, 594 F.Supp. 449, 453 (D.Haw.1984) ("A general statutory section setting forth legislative policy and purpose neither constitutes an operative section of the statute nor prevails over more specific provisions").

This Court is unable from the statute to determine what conduct the D.C. Council possibly could have intended to prohibit when it used the general language "economic life" in the introductory section of Subchapter II. This court is unwilling to open the Pandora's box in deciding what conduct constitutes an impingement of opportunity to participate in the "economic life" of the District of Columbia. Plaintiffs in essence are requesting that this Court act as a legislator which, respectfully, is a job more appropriate for the D.C. Council. The D.C. Council is in the better position to determine not only what conduct specifically impinges upon an individual's right to participate in the "economic life" of this city but, more fundamentally, whether all such conduct should be prohibited. This Court notes that even in areas in which the D.C. Council has specifically prohibited discrimination it has nonetheless provided for exceptions after determining that legitimate grounds exist in some instances to permit discriminatory conduct. *See* § 1–2513 (exceptions in employment for seniority systems and officer cadet programs); § 1–2518 (exceptions in housing for owner-occupied buildings); § 1–2521 (sex and age exceptions in educational institutions for private undergraduate and primary schools).

This Court's unwillingness to assume the role of legislator is all the more necessary where the D.C. Council has provided the D.C. Office of Human Rights with the mandate to investigate discrimination in accordance with the statements of purpose in §§ 1–2501 and 1–2511 for the *express reason* of "making appropriate recommendations for action, including legislation, against such discrimination." D.C. Code § 1–2541(b). Where the statutory scheme establishes an executive agency to investigate and recommend whether the D.C. Council should enact future legislation to prohibit certain discriminatory conduct in accordance with § 1–2511 the D.C. Council obviously could not have intended that discrimination in all aspects of economic life was covered under the statute; otherwise, § 1–2541(b) would be gratuitous.

### D. Standing

Even if the Plaintiffs were able to state a cause of action under § 1981 or the DCHRA, the Plaintiffs would not be able to proceed with these claims on the ground that they both lack standing.

#### 1. Plaintiff Gersman

■ Plaintiff Gersman concedes that he has no standing to redress an injury to Plaintiff CSI under § 1981 even though he is its president and principal shareholder. *See Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir.1981) (officers and shareholders cannot maintain action under Civil Rights Act of 1871, 42 U.S.C. § 1983, on behalf of corporation); *Erlich v. Glasner*, 418 F.2d 226, 228 (9th Cir.1969) (president and general manager of corporation who, with his wife, owned all the stock of corporation could not maintain action under 42 U.S.C. § 1983 to redress injury to corporation); *T & S Serv. Assocs., Inc. v. Crenson*, 505 F.Supp. 938, 943 (D.R.I.) (sole shareholder of corporation had no standing to maintain action under section 1981 to address injury to corporation), *vacated and remanded on other grounds*, 666 F.2d 722 (1st Cir.1981). Plaintiff Gersman nonetheless contends that he has standing to sue for his own injuries, namely, humiliation, that he suffered as a witness to Defendant's termination of the contract with Plaintiff CSI. However, Plaintiff CSI suffered the discriminatory conduct, or injury in fact, and not Plaintiff Gersman. There is no action under either section 1981 or the DCHRA

for third parties who suffer emotional injury after witnessing discriminatory conduct to others regardless of the nature of the relationship between the witness and the injured party.

### 2. Plaintiff CSI

■ Defendant contends that Plaintiff CSI does not have standing to sue under the DCHRA and § 1981 because corporations are legal entities separate and distinct from the religious and racial identities of the individuals who comprise the corporation. Plaintiff CSI argues that because the corporation is closely held by Plaintiff Gersman and his wife the identity of the corporation is therefore Jewish. The caselaw is split in the lower courts on whether a corporation can possess the identity of its members for purposes of a cause of action for discrimination.

In *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court stated that "a corporation ... has no racial identity and cannot be the direct target of the alleged discrimination." *Id.* at 263, 97 S.Ct. at 562. Although, as both Parties recognize, this language is dicta, the statement does not stand in jurisprudential isolation but is predicated on the long-standing recognition that a corporation is a creation of state law with the intent that it have an identity separate and distinct from that of its members or organizers. *See Moline Properties v. Commissioner*, 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943). Accordingly, this Court declines to treat the language as dicta and rules, as have other lower courts interpreting *Village of Arlington Heights,* that a corporation can have no religious or racial identity. *See, e.g., Triad Assocs., Inc. v. Chicago Hous. Auth.,* 1988 WL 6667, 1988 LEXIS 582, No. 87 C 5096 (N.D. Ill. Jan 27, 1988).

■ Even if a corporation could assume the racial or religious identity of its members, this Court would still rule that Plaintiff CSI did not have standing to bring this action. In *Hudson Valley Freedom Theater, Inc. v. Heimbach,* 671 F.2d 702 (2d Cir.1982), the court held that a corporation possesses a racial or religious identity to have standing to bring an action for racial discrimination under 42 U.S.C. §§ 1981 and 1983 only where a functional nexus exists between the purpose or activity of the corporation and the identity of the members of that corporation. *Id.* at 705–06. In *Hudson Valley Freedom Theater, Inc.,* the plaintiff was a nonprofit corporation "established for the very purpose of advancing minority interests," *id.* at 706, specifically, promoting black and Hispanic culture.

In the instant case, Plaintiff CSI is merely a vehicle by which Plaintiff Gersman has chosen to earn his living and the corporate purpose is independent of Plaintiff Gersman's religious faith or racial identity. In other words, Plaintiff CSI does not serve to advance Plaintiff Gersman's racial or religious identity but simply his economic interests. Although other courts have found that a corporation can have a racial or religious identity by the mere fact that it is owned or controlled by members of a protected class, *see, e.g., T & S Serv. Assocs. v. Crenson,* 505 F.Supp. at 943; *Howard Sec. Servs., Inc. v. Johns Hopkins Hosp.,* 516 F.Supp. 508, 513 (D.Md.1981), this Court finds them unpersuasive.

Accordingly, it is hereby

ORDERED that Defendant's motion to dismiss Plaintiffs' complaint is GRANTED.