EXECUTIVE SANDWICH SHOPPE, INC., Appellant,

v.

CARR REALTY CORPORATION, et al., Appellees.

No. 98–CV–735.

District of Columbia Court of Appeals.

Argued Jan. 20, 2000.
Decided April 13, 2000.

---

William S. Burroughs, Jr., Arlington, VA, for appellant.

Arnold S. Albert, with whom Andrew B. Schulwolf, Washington, DC, was on the brief, for appellees.

Before SCHWELB, RUIZ, and WASHINGTON, Associate Judges.

RUIZ, Associate Judge:

This appeal raises the question whether standing under the District of Columbia

Human Rights Act (DCHRA), *see* D.C.Code §§ 1–2501 to 1–2557 (1999), is limited to the intended target of discrimination. We hold that it is not, and that a party injured as a result of such discrimination has standing to sue under the DCHRA. The case arose out of a dispute between a landlord and tenant in connection with two proposed assignments of a retail lease for premises located at 1747 Pennsylvania Avenue, N.W., in Washington, D.C. Appellant, Executive Sandwich Shoppe, Inc. (ESS),[1] filed suit in the District of Columbia Superior Court on February 12, 1996, seeking to recover (a) in Counts I and II, for breach of its lease agreement with appellees;[2] (b) in Counts III and IV, under the DCHRA for harm resulting from racial discrimination against persons of Korean descent who were proposed as assignees of the lease; and (c) in Count V, for civil conspiracy to injure ESS in its business.[3] On March 21, 1996, appellees simultaneously filed a motion to dismiss, which argued that ESS lacked standing to pursue its DCHRA claims, and their answer to the complaint, which asserted, *inter alia*, a statute of limitations defense. Appellees also counterclaimed to recover unpaid rent and related charges accruing after ESS vacated the leased premises. The trial court dismissed Counts III and IV (the discrimination—based claims) pursuant to Superior Court Rule 12(b)(6) for failure to state a claim, on the ground that ESS lacked third-party standing under the DCHRA, and Count V (the civil conspiracy claim) for failure to allege a tort independent of the alleged violation of the DCHRA to support a civil conspiracy claim. Counts I and II, for breach of the

lease regarding proposed assignments to Jung Soon Chung and Tu Pyo Hong, respectively, proceeded to trial before the trial court pursuant to a jury waiver in the lease. The trial court ruled against ESS on these counts and awarded judgment for appellees on their counterclaim for unpaid rent and related charges. ESS timely appealed. We disagree with the trial court's dismissal of ESS's DCHRA claims for lack of standing and remand for consideration of those claims, as well as ESS's civil conspiracy claim consistent with this opinion. We affirm the remaining issues on appeal.

## I. Facts

ESS and the landlord entered a ten-year lease executed March 16, 1987, under which ESS occupied 1747 Pennsylvania Avenue, N.W., in the District of Columbia, and operated a sandwich shop from June 1987, until March 1996. The shop offered table service in one part and carry-out service in another part of the shop. ESS operated successfully and acceptably to the landlord until 1992, at which time the downtown retail market suffered a slowdown and the profitability of the restaurant suffered. ESS requested and was granted an addendum to the lease which reduced the rent slightly. In late 1992, ESS was put on the market through Thomas Papadopoulos, a business broker.

The lease contained the following provision regarding assignment:

12. *Assignment and Subletting*

A. Lessee may not sublet the Demised Premises. Lessee may not as-

---

1. The sole shareholder of ESS is Emanuel Skinarakis.

2. Appellees Carr Realty Corporation, Carr Realty, L.P., and 1747 Pennsylvania Associates, L.P., own and manage the building at 1747 Pennsylvania Avenue, N.W. ("landlord" or "lessor"). Appellees Larry Goodwin and John A. Asadoorian are former employees of Carr Realty Corporation. Herein they are collectively referred to as "appellees."

3. ESS originally filed a complaint in the United States District Court for the District of Columbia, alleging, *inter alia*, racial discrimination in violation of 42 U.S.C. § 1985. The district court dismissed the § 1985 claim on the ground that participation in commerce within the District of Columbia is not a right or privilege protected by § 1985, and dismissed the remainder of the federal suit for lack of other federal claims. ESS subsequently filed the instant suit in the District of Columbia Superior Court.

sign, sell or otherwise transfer the Lease without the prior written consent of Lessor, which consent may not be unreasonably withheld, delayed or conditioned, provided the assignee, purchaser or transferor has as much or more experience in the restaurant business as Lessee and has a financial statement that is equal to or better than the financial statement of Lessee. Any transfer of this Lease from Lessee by merger, consolidation, liquidation or otherwise by operation of law, including, but not limited to, an assignment for the benefit of creditors, shall be included in the term "assignment" for purposes of this lease.

The lease also contained the following relevant provisions:

I. *Use*

Lessee will use and occupy the demised Premises solely for (1) the purpose of operating a sit-down sandwich shop with carry-out service, for the retail sale of food and beverages, and shall serve on-premises food with china and flatware.

49. *Approval of Lessee's Decor*

It is the intent of the Lessor to maintain throughout the term of this lease, a high quality of decor throughout the Building.

. . . .

Lessee shall not change the design, including decorations, graphics or furnishings of the Demised Premises without having first obtained the written consent of Lessor as required by the provisions hereof.

### A. *Proposed Assignment to Jung Soon Chung*

On February 2, 1993, Jung Soon Chung signed a contract to purchase ESS at the price of $450,000 with the seller's guarantee of business in the amount of $22,000 in a two-week period and settlement to occur within thirty days. A letter from Mrs. Chung's counsel, Dimitri Mallios, dated February 4, 1993, requested assignment of the lease and an extension of the lease term to a full ten years. Included with the letter was an unaudited financial report and personal financial statement for Mrs. Chung. As a condition of acceptance, the landlord insisted on cancellation of the addendum to the lease which had reduced the rent payable by ESS during the remaining course of the lease term. On February 16, Mr. Mallios wrote to inform William Joseph H. Smith, attorney for ESS, that the request for assignment of the lease to Mrs. Chung had been denied. Thereupon, Mr. Smith, in a February 18 letter, acting on behalf of ESS, made an unequivocal demand for completion of the assignment at the rent set in the rent-reduction addendum and expressed the view that withholding consent based on that condition constituted an unreasonable withholding of consent under the terms of the lease.

On March 2, 1993, appellee Asadoorian, the retail lease agent for the landlord, met with ESS. This meeting resulted in Asadoorian's March 3 memorandum to appellee Goodwin in which he acknowledged that the landlord's position that the addendum should be nullified was untenable under the lease, and added: "Our basis for non-approval should be on the merits of the assignee and their experience in running the type of operation that [ESS] is." In a March 4 letter to Mr. Mallios, Asadoorian requested that Mrs. Chung submit supplemental financial information. On March 16, Mrs. Chung's counsel wrote to counsel for ESS to withdraw Mrs. Chung's offer and in a March 23 letter to Asadoorian expressed his impression that the "transaction was dead," but nevertheless enclosed the financial information requested by Asadoorian in his March 4 letter. On March 31, appellee Goodwin wrote to Mr. Smith expressing concerns about the financial materials furnished by the

Chungs.[4] Goodwin identified a discrepancy between the small amount of interest income reported on their 1992 federal tax return and the "$324,255 in potentially interest yielding assets" demonstrated on the financial statement provided, and expressed concern that "[t]hings don't seem to add up."[5] On April 7, 1993, ESS authorized the broker to return the $20,000 deposit to Mrs. Chung.

### B. Proposed Assignment to Tu Pyo Hong

ESS entered a contract to sell its business to Tu Pyo Hong on June 4, 1993, the contract to close in twenty-seven days, on or before July 1, 1993. The contract provided for a purchase price of $250,000, which was $200,000 less than in the contract with Mrs. Chung. The contract also provided for a business guarantee of $20,000 in a two week period, plus or minus five percent. On June 7, the broker, Mr. Papadopoulos, wrote Asadoorian enclosing financial information in support of the assignment of the lease to Mr. Hong. In response, on June 14, Asadoorian requested supplemental information, including information regarding Mr. Hong's business experience. The requested information was furnished by letter on June 16. In the interim, Mr. Hong wrote to Mr. Papadopoulos expressing concern that the lease's use clause appeared to prohibit his planned introduction of a salad bar. On July 1, the contract settlement deadline, Asadoorian wrote to Mr. Papadopoulos granting approval of the assignment to Mr. Hong, but noting disapproval of the plan to put in a hot and cold salad bar. The landlord's position was clarified and reiterated in a letter dated July 23: "the proposed change in the presentation of food (i.e. the self-service food bar) is not acceptable to the Lessor." The sale of ESS to Mr. Hong was not consummated.

### C. Landlord's Counterclaim

ESS ceased paying rent in December, 1995, but continued to occupy the premises until March, 1996, when it went out of business. The lease was to expire November 30, 1997. Unpaid rent accrued at the rate of $7,093.33 per month beginning in January, 1996, and at the rate of $7,600 per month beginning in December, 1996. The landlord made efforts to secure a new tenant and leased the premises to a successor tenant in early 1997, the tenant taking possession in March, 1997.

### D. Evidence of Discrimination

Counts III and IV of ESS's complaint allege that appellees "interrupted, terminated, refused and failed to initiate and conduct, and required different terms for, a transaction in real property ... for wrongfully discriminatory reasons." Although these claims were dismissed prior to trial, ESS nevertheless elicited testimony regarding appellees' alleged discriminatory animus. At trial, Mr. Smith, the attorney for ESS, testified that he met with Asadoorian shortly after receiving the March 31 letter and was told, in response to his query as to why obtaining the approval was so difficult, that "[w]e don't like to lease to Orientals because they keep their shops dirty .... We like the way Emanuel [Skinarakis] runs his shop. He has a nice shop.... We're trying to sell it to a Greek." Mr. Skinarakis testified that, during pendency of the proposed assignment to Mrs. Chung, Asadoorian told him, "between you and I, my company doesn't like Oriental people, especially in the International Square we have Koreans ... And they are dirty. And they change the menu. Then they're filthy. And they change the concept of the restaurant."

4. Although the sales agreement was only signed by Mrs. Chung, Mr. Mallios provided joint financial information for her and her husband, Hyuk Chung.

5. The landlord was unaware of several significant judgments rendered against the Chungs around the time of the negotiations. At trial the financial statement was proved to be fabricated.

Mrs. Chung's counsel, Mr. Mallios, testified that he did not think there was any exceptional treatment of the Chungs or of Orientals generally in his previous dealings with Asadoorian.

## II. District of Columbia Human Rights Act

### A. Standing Under the DCHRA

 We first consider ESS's argument that the trial court erred by dismissing Counts III and IV for lack of standing under the DCHRA. Because a motion to dismiss a complaint under Rule 12(b)(6) "presents questions of law, our standard of review for dismissal for failure to state a claim is *de novo.*" *Johnson–El v. District of Columbia,* 579 A.2d 163, 166 (D.C.1990) (citations omitted). The DCHRA makes it unlawful to "interrupt or terminate, or refuse or fail to initiate or conduct any transaction in real property; or to require different terms for such transaction," D.C.Code § 1–2515(a)(1) (1999), on the basis of "the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, disability, matriculation, political affiliation, source of income, or place of residence or business of any individual," § 1–2515(a). " 'Transaction in real property' means the exhibiting, listing, advertising, negotiating, agreeing to transfer or transferring, whether by sale, lease, sublease, rent, assignment or other agreement, any interest in real property or improvements thereon, including, but not limited to, leaseholds and other real chattels." D.C.Code § 1–2502(30).

Count III of ESS's complaint alleges that Carr Realty, Carr Realty L.P. and 1747 Pennsylvania Avenue Associates "interrupted, terminated, refused and failed to initiate and conduct, and required different terms for, a transaction … based on the race, national origin and personal appearance of Mrs. Chung and Mr. Hong,"

in violation of D.C.Code § 1–2515(a) and (b). Count IV alleges that the same actions were taken by Asadoorian and Goodwin in their individual capacities. ESS alleges that as a result of appellees' discriminatory actions in refusing assignment of the lease to ESS's prospective assignees, the sale of ESS failed to take place and ESS continued to suffer business losses. The trial court dismissed ESS's claims under the DCHRA based on appellees' argument that the prospective assignees, who were not parties to the action, were the actual targets of discrimination, and therefore ESS had no standing to pursue claims based on discrimination against third parties under the DCHRA.

As one court has noted, "[w]hether a party is asserting its own rights, as opposed to seeking to vindicate the rights of a third party, is often a difficult question." *Benjamin v. Aroostook Med. Ctr., Inc.,* 57 F.3d 101, 105 (1st Cir.1995). Although the trial court decided the motion to dismiss as a question of third-party standing, and each party has argued the standing issue to this court as one of third-party standing, we do not understand ESS to state a derivative claim. ESS's complaint alleges a direct harm to its pecuniary interests as a result of appellees' alleged discriminatory animus toward the proposed assignees. ESS neither seeks to stand in the place nor assert the rights of the rejected assignees. With the understanding that ESS has alleged direct harm to its interests, it is still necessary to consider whether such a claim may be maintained under the DCHRA by a litigant who was not the intended victim of discrimination.[6]

 "In essence the question of standing is whether the litigant is entitled to have the court decide on the merits of the dispute or of particular issues," *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting

6. Because we recognize ESS to claim direct, rather than third-party, standing under the DCHRA, we express no opinion concerning

the availability of third-party standing under the DCHRA.

*Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)), or, put another way, "the determination of whether a specific person is the proper party to bring a matter to the Court for adjudication." ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 2.3, at 56 (3d ed.1999). Constitutional standing under Article III requires the plaintiff to "allege personal injury fairly traceable to the defendant's unlawful conduct and likely to be redressed by the requested relief." *Wright,* 468 U.S. at 751, 104 S.Ct. 3315. Out of prudential concerns, "[s]tanding doctrine embraces several judicially self-imposed limits on the exercise ... of jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights ... and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* However, when Congress intends to extend standing to the full limit of Article III, the "sole requirement for standing ... [is a] minima of injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Thus, when standing is permissible to the limit of Article III, courts "lack the authority to create prudential barriers to standing." *Id.* With these principles in mind, we turn to standing under the DCHRA.

Section 1–2556 of the District of Columbia Code recognizes a private cause of action under the DCHRA, providing in pertinent part:

(a) Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate.

...

As a textual matter, the statute does not purport to limit the availability of an action under the DCHRA to only those persons who are the targets of discrimination. There is no statutory requirement that the litigant be a member of a protected class. Rather, the broad textual grant of standing in section 1–2556 extends to *"[a]ny person claiming to be aggrieved* by an unlawful discriminatory practice." (Emphasis added.) The DCHRA broadly defines a "person" as

any individual, firm, partnership, mutual company, joint-stock company, corporation, association, organization, unincorporated organization, labor union, government agency, incorporated society, statutory or common-law trust, estate, executor, administrator, receiver, trustee, conservator, liquidator, trustee in bankruptcy, committee, assignee, officer, employee, principal or agent, legal or personal representative, real estate broker or salesman or any agent or representative of any of the foregoing.

D.C.Code § 1–2502(21).[7] Accordingly, appellees' argument that the DCHRA confers standing only to the targets of discrimination finds no support in the language of the statute.

■ We have specifically stated on several occasions that the DCHRA is a remedial civil rights statute that must be generously construed. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 889 (D.C.1998); *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 398 (D.C.1991). Nevertheless, notwithstanding the plain language of the statute and our exhortations that it be generously construed, appellees argue that "any person" should not include anyone other than the direct target of discrimination, and urge that we recognize prudential limitations on standing under the DCHRA because a failure to do so would bring in so many potential plaintiffs that the purpose of the statute would be eviscerated.[8] Ap-

---

**7.** ESS, a corporation, is a "person" for purposes of the DCHRA.

**8.** Appellees are correct that generally one cannot assert claims for violation of the civil rights of another under 42 U.S.C. § 1981 or 42 U.S.C. § 1982 because "[p]rudential limi-

pellees' proffered interpretation is narrower than the statutory language and the opposite of generous construction. Moreover, we are not free to impose prudential limitations on standing even assuming that we were to agree, which we do not, that it would be wise to do so.

■ The DCHRA was passed to "underscore the Council's intent that the elimination of discrimination within the District of Columbia should have the highest priority." *Dean v. District of Columbia,* 653 A.2d 307, 319 (D.C.1995) (citing COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS, COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE REPORT OF BILL 2–179, "THE HUMAN RIGHTS ACT OF 1977," at 3 (1977)). "The Council undoubtedly intended the Human Rights Act to be a powerful, flexible, and far-reaching prohibition against discrimination of many kinds." *Id.* Although we have noted that the Council did not intend the DCHRA to prohibit every discriminatory practice, *see, e.g., Evans v. United States,* 682 A.2d 644, 648 (D.C.1996); *Dean,* 653 A.2d at 319, it nevertheless follows that standing under the DCHRA should be accorded a broad enough construction to make a remedy available from those forms of discrimination which the statute does reach. We traverse no new epistemological territory when we recognize that discrimination not only inflicts an injury on the individual who is targeted for discrimination but also exacts a social and economic toll from others. *See, e.g., Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (recognizing that discrimination causes injury to the whole community); *Cf. Katzenbach v. McClung,* 379 U.S. 294, 300, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (noting that local discrimination affects national commerce). Limiting standing under the DCHRA to only the direct targets of discrimination would limit the flexibility of the DCHRA as a tool to eliminate discrimination and hamstring efforts to effect the statute's broad purpose. That a plaintiff's alleged injury is predicated upon discrimination against a person other than him or herself presents a jury question as to whether an "unlawful discriminatory practice" occurred and whether the plaintiff was thereby "aggrieved"; it is not, however, a question of justiciability.

■ Moreover, appellees' arguments for prudential limitations on standing were

tations on standing ordinarily require than an action under section 1981 or 1982 be brought by the direct victims of the alleged discrimination because they are best suited to assert the individual rights in question." *Clifton Terrace Assocs. v. United Techs. Corp.,* 289 U.S.App.D.C. 121, 128, 929 F.2d 714, 721 (1991); *see also Mackey v. Nationwide Ins. Co.,* 724 F.2d 419, 421–22 (4th Cir.1984) (same). The assertion of a claim based on the violation of another's civil rights, a classic third-party claim, may also run afoul of Article III's "case or controversy" requirement. *See Warth,* 422 U.S. at 502, 95 S.Ct. 2197. Likewise, neither § 1981 nor § 1982 specifically confer standing within the statute itself. As explained above, such concerns are not present in this case because ESS has asserted a direct injury and the DCHRA permits such claims. In this respect the present case is similar to *Walker v. Pointer,* 304 F.Supp. 56 (N.D.Tex.1969). In *Walker,* the plaintiffs' § 1982 claim contended that they were evicted from their apartment because they had black guests. According to the plaintiffs' allegations, they were "direct victims of black racial discrimination, discrimination directed at them because of their black associations." *Id.* at 58. As a preliminary matter, the court considered whether, despite the language of § 1982 that "[a]ll citizens of the United States" are to be protected against discrimination, § 1982 could only be invoked by black citizens, or whether § 1982 was "availab[le] to white plaintiffs as part of a greater class of 'all citizens.'" *Id.* The court rejected the proposition that § 1982 covered "only those suffering from discrimination against black people who happen to be black," and held that, having alleged a direct injury, the plaintiffs were "within the jurisdictional scope" of the statute. *Id.* at 60. *See also Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (white plaintiff has standing under § 1982 to redress expulsion from corporation organized to operate a community park and playground facilities for the benefit of the area residents after being refused approval of an assignment of his lease because of the assignee's race, on whose behalf the plaintiff had advocated).

foreclosed by *Molovinsky v. Fair Employment Council of Greater Washington*, 683 A.2d 142, 146 (D.C.1996), in which we held that "standing under the DCHRA is coextensive with standing under Article III."[9] Therefore, for standing under the DCHRA, the plaintiff needs to allege "a minima of injury in fact," *Havens Realty*, 455 U.S. at 372, 102 S.Ct. 1114, and this court "lack[s] the authority to create prudential barriers to standing" under the DCHRA. *Id.* This case is similar to cases granting standing under the Fair Housing Act (FHA), 42 U.S.C.A. §§ 3601–3631 (1994 & Supp.1999). For example, in *Trafficante* the Supreme Court noted that "complaints by private persons are the primary method of obtaining compliance with the Act," and held that under the Act standing is as broad as is permitted under Article III. 409 U.S. at 209, 93 S.Ct. 364. In *Trafficante*, two tenants of an apartment complex sued the apartment owner alleging discriminatory housing practices. The lower courts held that the plaintiffs had no standing to bring the suit because only individuals who are the objects of the discriminatory practices could sue under

the Act. The Supreme Court reversed, holding that given the broad statutory grant of standing, the plaintiffs had alleged a particular injury in fact, "the loss of important benefits from interracial associations." *Id.* at 210, 93 S.Ct. 364. Here, ESS has alleged a more tangible and quantifiable pecuniary loss as a result of appellees' alleged discrimination.[10]

## B. Statute of Limitations under DCHRA

Appellees' answer to ESS's complaint below asserted an affirmative defense that the complaint was barred by the statute of limitations. *See* Super. Ct. Civ. R. 8(c) (2000). The DCHRA provides in relevant part:

> A private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof, except that *the limitation shall be within 2 years of the unlawful discriminatory act, or the discovery thereof, for complaints of unlaw-*

9. In *Molovinsky*, we noted that "[t]he Supreme Court has construed the nearly identical language of the Civil Rights Act of 1968 ('any person who claims to have been injured') to confer standing to the full extent that Article III of the Constitution permits." *Molovinsky*, 683 A.2d at 146. The Fair Housing Act, 42 U.S.C. § 3610(a)(1)(a)(i), states that "[a]n aggrieved person may ... file a complaint ...." 42 U.S.C. § 3602(i)(1) defines an "aggrieved person" as "any person who claims to have been injured by a discriminatory housing practice."

10. Nor does the United States District Court for the District of Columbia's opinion in *Gersman v. Group Health Assoc.*, 725 F.Supp. 573 (D.D.C.1989), which is not binding on this court, convince us otherwise. In *Gersman*, plaintiffs Gersman and Computer Security International (CSI), the corporation of which Gersman was the president and principal stockholder, alleged injuries under 42 U.S.C. § 1981 and the DCHRA as a result of the defendant terminating a contract with CSI for allegedly discriminatory reasons. After holding that "discrimination in all aspects of economic life" was not covered by the DCHRA

and that Gersman had no standing to pursue a § 1981 claim on behalf of CSI, the court continued thus:

> Plaintiff Gersman nonetheless contends that he has standing to sue for his own injuries, namely, humiliation, that he suffered as a witness to Defendant's termination of the contract with Plaintiff CSI. However, Plaintiff CSI suffered the discriminatory conduct, or injury in fact, and not Plaintiff Gersman. There is no action under either section 1981 or the DCHRA for third parties who suffer emotional injury after witnessing discriminatory conduct to others regardless of the nature of the relationship between the witness and the injured party.

725 F.Supp. at 577–78.

To the extent that the district court's opinion can be read to suggest that standing under the DCHRA is limited to those persons of the race or other group against whom discrimination is prohibited, we now hold otherwise. To the extent that this language can be understood as simply holding that the type of injury Gersman purported to assert is not redressable under the DCHRA, we offer no opinion as to its correctness as it is not asserted in the case before us.

*ful discrimination in real estate transactions* brought pursuant to this chapter or the FHA. The timely filing of a complaint with the [District of Columbia] Office [of Human Rights] shall toll the running of the statute of limitations while the complaint is pending before the Office.

D.C.Code § 1–2556(a) (emphasis added). Because these counts of ESS's complaint were brought under D.C.Code § 1–2515(a) and (b), alleging unlawful discrimination in real estate transactions, the DCHRA claims must have been brought "within 2 years of the unlawful discriminatory act, or the discovery thereof." D.C.Code § 1–2556.

■■■■ ESS argues that we should not reach appellees' statute of limitations defense because appellees have either waived the defense or are estopped from raising the statute of limitations because it was not pursued in the motion to dismiss below. We reject these arguments.

■■■■ "The statute of limitations is an affirmative defense which ... must be set forth affirmatively in a responsive pleading and may be waived if not promptly pleaded." *Feldman v. Gogos,* 628 A.2d 103, 104 (D.C.1993) (quoting *Whitener v. Washington Metro. Area Transit Auth.,* 505 A.2d 457, 458 (D.C. 1986)) (internal quotes omitted); Super. Ct. Civ. R. 8(c). Although the defense of

statute of limitations is not listed in the rule, the defense also may be raised by a motion to dismiss under Rule 12(b)(6). *See Jones v. Rogers Mem. Hosp.,* 143 U.S.App.D.C. 51, 53, 442 F.2d 773, 775 (1971). Under such a circumstance. the defense acts to bar the claim for failure to state a claim upon which relief can be granted. *See* 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[4][b] (3d ed. 1998) ("Dismissal under Rule 12(b)(6) may also be appropriate when a successful affirmative defense or other bar to relief appears on the face of the complaint, such as ... the statute of limitations."); Super. Ct. Civ. R. 12(b)(6). As one court has noted however, "the fact that the [statute of limitations] *may* be raised in a pre-answer motion does not necessarily mean that it *must* be." *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 992 F.Supp. 1218, 1225 (D.Nev.1998). Under Rule 8(c) the statute of limitations is an affirmative defense to be asserted in a responsive pleading. *See* Super. Ct. Civ. R. 8(c). The express terms of Superior Court Rule 12(h)(2) provide that a 12(b)(6) defense "may be made in any pleading permitted or ordered under Rule 7(a),[11] or by motion for judgment on the pleadings, or at the trial on the merits,"[12] and Rule 12(g) expressly provides that such a claim is not waived by a failure to include it in a Rule 12 motion raising other defenses.[13]

---

**11.** Rule 7(a) reads as follows:

There shall be a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and third-party answer, if third-party complaint is served. No other pleading shall be allowed, except that the court may order a reply to an answer or a third-party answer.

**12.** Rule 12(h) reads in pertinent part:

(1) A defense of lack of jurisdiction over the person, insufficiency of process, or insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g) or (B) if it is

neither made by motion under this Rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

(2) *A defense of failure to state a claim upon which relief can be granted,* a defense of failure to join a party indispensable under Rule 19, and an objection or failure to state a legal defense to a claim *may be made in any pleading permitted or ordered under Rule 7(a),* or by motion for judgment on the pleadings, or at the trial on the merits. Super Ct. Civ. R. 12(h) (emphasis added).

**13.** Rule 12(g) reads in pertinent part as follows:

A party who makes a motion under this Rule may join with it any other motions

*See Santos v. District Council of New York City and Vicinity of United Brotherhood of Carpenters and Joiners of Am.,* 619 F.2d 963, 967 n. 4. (2d Cir.1980); *Tahoe–Sierra,* 992 F.Supp. at 1225. Accordingly, the assertion of the limitations defense has not been waived. *Santos,* 619 F.2d at 967; *Kulzer v. Pittsburgh–Corning Corp.,* 942 F.2d 122, 125 (2d Cir.1991); *Tahoe–Sierra,* 992 F.Supp. at 1225.

■ ESS further argues that, because the trial court dismissed the DCHRA counts on standing grounds, neither party focused on the issue of whether the statute of limitations had run and thus appellees should be estopped from asserting it further. Although there are situations in which a court may preclude a party from asserting a statute of limitations defense when to allow the defense would be prejudicial to the plaintiff, *see, e.g., District of Columbia v. Tinker,* 691 A.2d 57, 61 (D.C. 1997) ( holding it was "incumbent on [plaintiff] to make a showing of prejudice resulting from the [defendant's] failure to raise the defense earlier"); *Raney v. District of Columbia,* 892 F.Supp. 283, 285 (D.D.C.1995) ("substantial prejudice" would adhere to plaintiff which had incurred substantial legal costs in conducting discovery and preparing for trial if defendant were allowed to assert a statute of limitations defense which had been pleaded in original answer but not in answer to the amended complaint and had not thereafter been asserted); *McGraw v. Matthaei,* 388 F.Supp. 84, 88 (E.D.Mich. 1972) (refusing to allow amendment of pleading to assert statute of limitations defense on the last day of trial), this is not such a case. Appellees did not delay

raising the statute of limitations defense, as they properly asserted it in their first responsive pleading to ESS's complaint. *See* Super. Ct. Civ. R. 8(c). Nor has ESS incurred needless litigation expenses in pursuing a claim that would otherwise have been barred by the period of limitations having run. The DCHRA statute of limitations has no effect on the claims which survived the trial court's original dismissal and were pursued through trial. Rather, section 1–2556 presents a time bar only to those claims which were originally dismissed and thus not further pursued until this appeal. Likewise, ESS was on notice that running of the statute of limitations had been raised as a defense against its claims. Under these circumstances we see no reason that appellees should be estopped from maintaining their properly asserted defense.

■ We turn, therefore, to appellees' argument that, even if ESS has standing to bring claims under the DCHRA, the trial court's Rule 12(b)(6) dismissals of those claims should be affirmed on the alternative ground that the DCHRA claims are time-barred by the Act's statute of limitations.[14] The trial court did not rule on this alternative ground for dismissal because the statute of limitations defense was not raised in appellees' Motion to Dismiss, but rather in their answer to the complaint.[15] "What constitutes the accrual of a cause of action is a question of law; the actual date of accrual, however, is a question of fact." *Cevenini v. Archbishop of Washington,* 707 A.2d 768, 770–71 (D.C.1998). Because the trial court had no further opportunity to consid-

herein provided for and then available to the party. If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.

14. It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court. *See Garrett v. Washington Air Compressor Co.,* 466 A.2d 462, 464 n. 5 (D.C.1983).

15. There is no question that ESS's breach of contract claims in Counts I and II were filed within the applicable three-year statute of limitations. *See* D.C.Code § 12–301(7) (1995).

er the limitations defense once it had dismissed the DCHRA counts for lack of standing, the parties had no reason to develop the record on the question of accrual. Although it appears from the facts before us that ESS's DCHRA claims may be time-barred, we are cognizant that there has been no fact-finding on the issue of accrual and that the record may be incomplete on this issue.[16] *See Davis v. United States*, 564 A.2d 31, 40 (D.C.1989) (en banc) (noting "general principle that appellate courts should defer to the trier of fact because, as a functional matter, the trier of fact is better positioned to make such findings"). Just as we conclude that the dismissal of the DCHRA claims for lack of standing at an early procedural juncture should not preclude appellees from pursuing their statute of limitations defense to those claims, so we conclude that the appellant should have an opportunity, not presented in the trial court, to respond to appellees' defense.[17]

## III. Breach of Contract Claims

ESS argues that the trial court erred in (1) finding that appellees' actions were not the proximate cause of the failure of the Chung deal to close, (2) misconstruing the use clause of the lease agreement concerning the Hong contract, and (3) holding in the appellees' favor on the counterclaim for unpaid rent.

### A. Count I: Chung Contract

Under the terms of the lease's assignment clause, the landlord's consent to a proposed assignment could not be "unreasonably withheld, delayed or conditioned" so long as the proposed assignee had "a financial statement that is equal to or better than the financial statement of [ESS]."[18] The trial court found that the landlord's original insistence on conditioning the assignment to Mrs. Chung on her acceptance of the original contract rent rather than the reduced rent provided in the 1992 rent-reduction addendum was inconsistent with the plain language of the lease and thus a breach of the assignment provision. It further held, however, that notwithstanding this breach, ESS had failed to prove it suffered damages as a result of the breach because the landlord had valid concerns over Mrs. Chung's financial situation and ESS could not demonstrate that these concerns were unreasonable.

ESS challenges the court's finding that its alleged damages were not proximately caused by appellees' breach of its contractual duty, arguing that as a result of the landlord's breach it suffered lost profit from the sale and subsequent business losses. "Under a breach of contract . . . a defendant is liable for such damages

16. For example, nothing in the record indicates whether a complaint was filed with the District of Columbia Office of Human Rights which would have tolled the limitations period pursuant to D.C.Code § 1–2556. We also note that the content and date of the alleged discriminatory statements against "Orientals" was presented though the testimony of Emanuel Skinarakis and ESS's counsel at trial and were not part of the complaint.

17. From the facts alleged in ESS's complaint and developed at trial, appellees' alleged discriminatory acts concerning Mrs. Chung appear to have taken place, at the latest, as of March 31, 1993, and with Mr. Hong as of July 30, 1993, because the alleged breaches of the lease contract are also the alleged discriminatory acts under the DCHRA. Nevertheless, ESS represents to this court that additional

facts can be presented to the trial court on remand which would defeat appellees' statute of limitations defense.

18. As a preliminary matter, the trial court, finding the provision ambiguous, construed the contract to contemplate that the operative date of comparison of the lessee's financial statement would be the date of the original lease, rather than lessee's financial statement on the date of assignation. Interpreting the contract to contemplate the former date protects the lessor against having to accept an assignment from a significantly weaker assignee than it had originally contracted with in the lease, for example, in a situation where the current lessee's financial situation is diminished. We find this a reasonable construction of the contract language.

as are the natural consequence and proximate result of his conduct." *Murphy v. O'Donnell*, 63 A.2d 340, 342 (D.C.1948) (quoting *Thompson v. Rector*, 83 U.S.App. D.C. 371, 373, 170 F.2d 167, 169 (1948)); *Bacmo Assocs. v. Strange*, 388 A.2d 487, 489 (D.C.1978) (same). "While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages." *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C.1982). The trial court's finding that the landlord had reasonable concerns regarding the proposed assignee's financial status given irregularities in the unaudited financial statement and other materials presented by Mrs. Chung, concerns which were later validated when the financial statement was proved fabricated, is not clearly erroneous. Although ESS may have suffered damages as a result of the contract with Mrs. Chung not closing, because the landlord's concerns were reasonable and ESS could not demonstrate to the trial court that Mrs. Chung's financial condition was comparable to that of ESS at the time it entered into the lease, the landlord's withholding of consent to the proposed assignment, even though in breach of the lease, was not a proximate cause of the alleged damages.

### B. Count II: Hong Contract

The trial court found that ESS also had not met its burden of proof regarding the landlord's alleged breach of the lease agreement concerning the proposed assignment to Mr. Hong. The trial court specifically found that the landlord "was not obligated to modify the lease to allow installation of the proposed salad bar," and was therefore "within its rights to refuse the assignment of the contract." The trial court found that the language of

the use clause "appears clear and unambiguous and would not allow operation of a salad bar or cafeteria type of operation without modification." Unlike in the previous contract for sale to Mrs. Chung, appellees consented to the assignment to Mr. Hong, but refused to modify the use clause so as to permit the change to the operation of the restaurant Mr. Hong desired. ESS argues that Mr. Hong only wanted to rearrange some portable equipment to utilize a salad bar, and that the conditional approval was granted on the very day that settlement on the contract was to take place. As a result of the unreasonable condition concerning the salad bar and attendant delay in consenting to the assignment, allegedly prompted by discriminatory animus, argues ESS, the lease was breached by the landlord.

The trial court held as a matter of law that approval of the assignment was not unreasonable as to constitute a breach of the contract. Appellees had made it clear prior to the time for settlement that Mr. Hong satisfied the finance and experience criteria. Moreover, all parties were involved in discussions over the "use clause" during the period leading to the date the contract was to settle and Asadoorian had requested a schematic drawing from Mr. Hong, never provided, of the proposed rearrangement of the restaurant prior to approval. As early as June 9, 1993, Mr. Hong had expressed concern to the leasing agent over potential problems with the use clause. The trial court's finding that the proposed salad and hot bar would require modification of the lease's use clause and that the landlord was not obligated to change the clause, was not clearly erroneous, nor was its holding that appellees neither unreasonably delayed approval nor wrongfully conditioned the assignment.[19]

19. The trial court granted appellees' counterclaim for back rent finding that "without a breach on the landlord's part. [ESS] remained under an obligation to continue to pay rent upon the premises." This disposition is clearly correct given that there was no

breach of the lease contract in regards to Mr. Hong, and, although the original conditioning of the assignment to Mrs. Chung was a breach of the assignment provision, it was not a breach, given the failure of Mrs. Chung to satisfy the required financial criteria, which

## IV. Civil Conspiracy

Finally, ESS argues that the trial court wrongfully dismissed its complaint for civil conspiracy on the ground that, in the absence of the alleged violations of the DCHRA, there was no independent tortious act to support the alleged conspiracy of the individual defendants, as required by *Halberstam v. Welch*, 227 U.S.App.D.C. 167, 705 F.2d 472 (1983). Count V of ESS's complaint reads:

*Civil Conspiracy by Individual Defendants to Violate Human Rights and to Injure Plaintiff's Business*

In the further alternative to Count III, Mr. Goodwin and Mr. Asadoorian, each acting outside the scope of his respective employment, conspired for the purpose of violating the Act, D.C.Code Sections 1–25515(a) and 1–2515, in the manner described above; and for the purpose of wrongfully injuring Plaintiff in its business in the manner described above. The latter two defendants so conspired, and carried out the said wrongful acts and omissions in furtherance of such conspiracy, wrongfully, in that the objectives of such conspiracy were and are illegally and intentionally designed to inflict harm upon Plaintiff, whereby Plaintiff has been damaged.

▮▮▮▮▮ The elements of civil conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Griva v. Davison*, 637 A.2d 830, 848 (D.C.1994); *see Halberstam v. Welch*, 227 U.S.App.D.C. at 172, 705 F.2d at 477. "[T]here is no recognized independent tort

action for civil conspiracy in the District of Columbia." *Waldon v. Covington*, 415 A.2d 1070, 1074 n. 14 (D.C.1980). "[C]ivil conspiracy depends on performance of some underlying tortious act." *Halberstam*, 227 U.S.App.D.C. at 174, 705 F.2d at 479. It is thus "not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." *Id.* The trial court held below that absent an underlying DCHRA claim, which had been dismissed for lack of standing, ESS had alleged no independent tort action to support the civil conspiracy claim.

▮▮▮▮▮ Construing ESS's complaint liberally, *see McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (1979), we assume for purposes of this opinion that the civil conspiracy count in ESS's complaint can be construed to allege a civil conspiracy under two distinct theories, (1) a conspiracy to violate the human rights of Mrs. Chung and Mr. Hong, and thereby the DCHRA, resulting in harm to ESS, and (2) a conspiracy to directly injure ESS's business by scuttling the proposed sales and assignments, akin to the tort of interference with prospective economic advantage. Because we affirm the trial court's determination regarding the alleged contract breaches, ESS's civil conspiracy claim premised on an economic tort theory fails as a matter of law for lack of an underlying tortious act. On the other hand, because we hold that the trial court erred in its determination that ESS lacked standing under the DCHRA, it necessarily follows that its dismissal of the civil conspiracy count alleging violation of the DCHRA as the underlying tort must be reversed. On remand, however, the trial court should consider two

---

would have excused ESS from further performance under the lease contract. Because Mrs. Chung never satisfied the requirements of the assignment clause which would have given rise to the landlord's duty to accept the proposed assignee, appellees' breach did not contribute materially to the contract not clos-

ing. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 245 cmt. b. ("[I]f it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence.").

issues that apparently were not presented to the trial court below.

 First, the trial court should consider the applicability of the intracorporate conspiracy doctrine to the remaining civil conspiracy claim, premised on a violation of the DCHRA.[20] "The intracorporate conspiracy doctrine holds that ... a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir.2000). Second, we note authority which suggests that a claim of civil conspiracy does not lie for violation of a statute such as the DCHRA. In *Monsanto v. Electronic Data Sys. Corp.*, 141 A.D.2d 514, 529 N.Y.S.2d 512 (1988), the court rejected a civil conspiracy claim alleging employment discrimination under the New York Human Rights Law, noting that the "Human Rights Law is an action created by statute, which did not exist at common law, and therefore cannot give rise to tort liability." *Id.* at 514. Because these issues were not fully presented to this court and the trial court has not had the opportunity to make findings of fact and conclusions of law in the first instance, we do not address them at this juncture.

The judgment below is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

*So ordered.*

---

**20.** At oral argument members of the division questioned whether the intracorporate conspiracy doctrine would bar ESS's claim for civil conspiracy.