## The GEORGE WASHINGTON UNIVERSITY, Appellant,

v.

## Laura VIOLAND, Appellee.

### No. 04–CV–1237.

District of Columbia Court of Appeals.

Argued Jan. 19, 2006.

Decided Sept. 20, 2007.

Amended Jan. 31, 2008.[1]

---

sibling shall be entitled to receive an equal share of such payment.

1. The Joint Pretrial Statement is signed by counsel for the plaintiff and the defendant. Under the heading "Claims and/or Defenses,"

the plaintiff identified seven (7) claims, and for defenses, the defendant made one statement: "Defendant denies each and every allegation asserted by Plaintiff." The Pretrial Order issued by the trial judge after a Novem-

ber 6, 2002, Pretrial Conference with the parties specified, in part: "Except as modified by this Order, the parties' Joint Pretrial Statement is incorporated in this Pretrial Order. **No other claims or defenses will be entertained at trial absent exceptionally good cause."** (Emphasis in original).

Andrew H. Baida, pro hac vice, with whom Karen A. Khan and Timothy W. Romberger were on the brief, Washington, DC, for appellant.

Robert L. Bell for appellee.

BEFORE: WASHINGTON, Chief Judge; FARRELL, RUIZ,*REID, GLICKMAN,*KRAMER, FISHER, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges; and * KING, Senior Judge.

## ORDER

PER CURIAM.

On consideration of appellant's motion for leave to file the lodged petition for rehearing or rehearing en banc, the response thereto, and appellee's motion to file the lodged errata sheet, it is

ORDERED that the motions are granted and the Clerk is directed to file the lodged appellant's petition for rehearing or rehearing en banc and the lodged errata sheet of appellee.

It is FURTHER ORDERED by the merits division * that the petition for rehearing is granted to the extent that this court's opinion filed September 20, 2007, (932 A.2d 1109, D.C.2007), is hereby vacated. That opinion issued on September 20, 2007, is hereby amended as follows; and the attached amended opinion, incorporating these changes, is issued on this date.

The second paragraph, left hand column and the first paragraph, right hand column of the **FACTUAL SUMMARY** at 932 A.2d at 1113 are modified, in part, to read:

GWU filed a motion for summary judgment on May 8, 2002, and an amended (technical) motion on May 21, 2002, basically arguing that Dr. Violand could not meet her burden to establish a *prima facie* case of pay discrimination. The motion contained a footnote indicating, in part, that "the majority of [Dr. Violand's] allegations are also barred by the applicable one year statute of limitations under the [DCHRA]," and that "[p]rocedurally, therefore, any claim arising prior to August 6, 2000 is time barred." However, the motion included neither textual argument concerning the statute of limitations, nor citation to any applicable case law. The Honorable Mary Ellen Abrecht denied GWU's summary judgment motion in an order docketed on June 6, 2002; the order did not mention GWU's footnote pertaining to the statute of limitations. On June 12, 2002, GWU filed a "Motion for Reconsideration of its Motion for Summary Judgment." No contention concerning the statute of limitations appeared in the motion for reconsideration. Dr. Violand opposed the motion for reconsideration on June 25, 2002. On July 1, 2002, Judge

Abrecht denied the motion for reconsideration, and stated that: "Summary judgment was denied because of disputed facts, especially facts concerning whether Plaintiff's fund raising work was equal to her comparator." The parties filed a joint pretrial statement on October 30, 2002. Under the section headed "Claims and/or Defenses," Dr. Violand set forth several, including: "Plaintiff was denied equal pay for equal work because of her sex in violation of the DCHRA." GWU stated simply: "Defendant denies each and every allegation asserted by Plaintiff."

Judge Abrecht filed a pretrial order on November 7, 2002, which, in part, incorporated the parties' Pretrial Statement, specified that "[n]o other claims or defenses will be entertained at trial absent exceptionally good cause," and stated that "[t]rial briefs for new calendar judge, if filed, [were] to be filed one week before trial...." On February 24, 2003, GWU filed a Trial Brief in the Civil Actions Branch of the trial court, with a copy to the Honorable Melvin Wright.

No other part of the **FACTUAL SUMMARY** is modified.

(2) In the **ANALYSIS,** the section on *The Statute of Limitations Issue* is modified at 932 A.2d at 1117, full paragraph of the right hand column and continuing in the carryover paragraph of the left hand column, 932 A.2d at 1118, to read:

*Ledbetter* does not control the outcome of GWU's appeal. Unlike the case before us, Ms. Ledbetter's former employer "contended ... throughout the litigation, that [her] pay claim ... was barred by Title VII's requirement that the conduct complained of in a Title VII action must have been the focus of an EEOC charge filed within 180 days of the occurrence of the conduct." *Ledbetter v. Goodyear Tire & Rubber Co.,* 421 F.3d 1169, 1176 (11th Cir. 2005). In contrast, although GWU raised a boilerplate statute of limitations affirmative defense in its answer to Dr. Violand's complaint ("Some or all of the claims set forth in the Complaint are barred by the applicable statute of limitations...."), it mentioned the statute of limitations in its motion to dismiss only with respect to the intentional infliction of emotional distress count. And, although GWU included a footnote on the statute of limitations in its motion for summary judgment, it made no textual argument on that subject and cited no applicable case law. Moreover, after the trial court denied its motion for summary judgment, with no mention of the statute of limitations, GWU lodged a motion for reconsideration. That motion contained neither argument nor a footnote on the statute of limitations and its relation to Dr. Violand's pay discrimination claim. Significantly, GWU did not assert the statute of limitations as an affirmative defense in the parties' joint pretrial statement.[1] The university's initial argument concerning the statute of limitations and the continuing violation theory first appeared in a trial brief, filed one week before trial. GWU also invoked this trial brief argument in a mid-trial motion to dismiss as a matter of law, and later during its renewed motion to dismiss. At that time the trial judge suggested that the issue should have been resolved before the case reached him for trial. Under these circumstances, we conclude that GWU waived or abandoned the statute of limitations defense.

There is a distinction between waiving or abandoning an affirmative defense and forfeiture of the defense: "Waiver is different from forfeiture. Whereas forfeiture

---

1. This opinion was originally issued on September 20, 2007. *See The George Washington Univ. v. Laura Violand,* 932 A.2d 1109 (D.C. 2007). Upon consideration of appellant's post-decision petition, this opinion is being reissued in amended form.

is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (citations omitted). Here, by not asserting the statute of limitations as an affirmative defense in its *pretrial statement* (or even in its motion for reconsideration of its motion for summary judgment), GWU waived or abandoned that affirmative defense. Attempting to assert it in a continuing violation argument in its trial brief, and again during mid-trial, came too late to avoid waiver or abandonment, especially since the trial court's pretrial order of November 7, 2002, incorporating the parties' joint pretrial order, declared in essence that any defense not appearing in the joint pretrial statement could not be raised at trial "absent exceptionally good cause." GWU did not offer an "exceptionally good cause" in its trial brief, nor in its mid-trial motion. Had the trial court entertained GWU's very late, mid-trial assertion of a statute of limitations defense with respect to the pay discrimination claim, Dr. Violand undoubtedly would have been prejudiced.

(3) In the **ANALYSIS,** the section on *The Statute Of Limitations Issue* is further modified at 932 A.2d at 1119, carry-over paragraph of the left-hand column, by *changing the sentence beginning,* "The exception that applies in this case", to read: "The exception that applies in this case is the second one, and we conclude that the legal principle governing waiver or abandonment of an affirmative defense constitutes 'a previously existing, independent legal basis (having nothing to do with retroactivity) for [declaring that *Ledbetter* does not control the outcome of the case

before us'].[4] *Reynoldsville Casket, supra,* 514 U.S. at 759, 115 S.Ct. 1745."

No other part of the analysis is amended.

It is FURTHER ORDERED that the petition for rehearing en banc is denied as moot, without prejudice to the filing of a petition for rehearing or rehearing en banc directed to the amended opinion issued on January 31, 2008.

Before REID and KRAMER, Associate Judges, and KING, Senior Judge.

Amended Order

REID, Associate Judge:

Appellant, The George Washington University ("GWU" or "the university"), appeals from the trial court's denial of its post-trial motions challenging a jury verdict in favor of appellee, Laura Violand, on her complaint alleging unequal pay because of her sex (female) (Appeal No. 04–CV–1237).[2] We affirm the judgment of the trial court.

**FACTUAL SUMMARY**

The record shows that Dr. Violand graduated from the University of Maryland in 1977, and began her employment with GWU in 1978 as a front desk clerk at the Registrar's Office. In the same year, she enrolled in graduate school at GWU while continuing to work there, received a Masters of Education degree in 1982, and in that same year enrolled in a doctoral program at GWU. GWU awarded her a Doctorate of Education degree in 1998; her dissertation focused on a case study of major alumni and non-alumni donors during one of GWU's capital campaigns.

Dr. Violand's work with GWU's Division of Alumni & Development commenced in 1982. She first worked on the alumni side

---

**2.** Appellee also noted an appeal (No. 04–CV–1318), relating to attorney's fees, which we treated as a cross-appeal. However, in her brief appellee states that she "consents to the dismissal of the cross-appeal." Therefore, we dismiss Appeal No. 04–CV–1318.

of the Division and then became Donor Relations Manager on the development side in 1987. She moved to the position of Assistant to the Executive Director in the development office of the GWU Medical Center in 1988. She was promoted to Manager, Medical Center Donor Relations and Communications in 1994. After Jack Feldman was hired in late 1995 as Director of Development at a salary of $75,000.00, Dr. Violand reported to him for about three months. Some time around Summer 1996, the Associate Vice President of GWU (for Medical Center and Alumni Relations), Mary Campion, asked Dr. Violand "to help with going out to meet alumni and solicit gifts" for the Medical Center. Dr. Violand, whose salary was $38,000.00 at that time and later increased to $40,000.00 due to increments, reported to Ms. Campion, as did Mr. Feldman.

Dr. Violand traveled in the Metropolitan Washington area to solicit gifts and after approximately one year expanded her base to points "[a]cross the country." She not only made contacts in various phases (including initial contacts or "introductory moves" and "cultivation"), but also solicited donors, including major donors, that is those who "contributed $50,000 or more" to the university. She filed "contact reports" reflecting the different phases of her work with potential donors. Dr. Violand became Assistant Director of Medical Center Development in December 1997, but did not receive a salary increase.

In early 1998, Ms. Campion left and ultimately was replaced by Sol Margulies. Although Dr. Violand asked him for a salary increase, none was forthcoming, only cost of living increases. When Dr. John Grossman replaced Mr. Margulies in 2000, Dr. Violand also requested a salary increase from him, without success. And, she discovered in 2000, that personnel papers reflecting her position as Assistant Director of Medical Center Development had never been "officially routed through the personnel system," and she "was formally still manager, donor relations and communications." In 2001, Dr. Violand again did not receive a salary increase. On January 5, 2001, Dr. Grossman sent her a memorandum thanking her for her "efforts, ideas, and willingness to work as a supportive team member in the Office of Medical Center Development and Alumni Affairs," and informing her that her 2001 annual salary was $42,574.32. Dr. Violand sent an e-mail response to Dr. Grossman, with copies to other GWU officials, because she was "enraged, and disgusted, and hurt" about the amount of her paychecks even though she (a woman) was performing the same type of work as Dr. Feldman. Previously, Dr. Violand had sent a memorandum to Cynthia Richardson Crooks of the Equal Employment Activities office detailing her work from July 2000 to December 11, 2000, and including a listing of monies she had raised for GWU in that time period and in the prior fiscal year. Dr. Grossman supervised Dr. Violand, and Dr. Feldman until he left his position in June 2002. Furthermore, Dr. Violand continued to perform the same work, and she and Dr. Feldman "divided up the country" in terms of their fundraising efforts.

Although Dr. Feldman began his employment with GWU in late 1995, as Director of Development for the Medical Center "at a salary of $75,000 maybe," and supervised Dr. Violand and other employees, he soon ceased his supervisory duties because of a substantial reduction in force. His title was changed to Director of Major Gifts and, according to him, everyone "whether ... a secretary or a director of Major Gifts or director of Pla[nned] Giving, ... all reported to [Ms. Campion]" and her successors. Dr. Feldman traveled locally and to other parts of the country, made face-to-face contacts with potential

donors (visitations and solicitations)—visited them, listened to them, talked with them, solicited money from them, and completed contact reports. In April 2001, after GWU's hospital was sold, Dr. Feldman left the Medical Center for a development position in the GWU library, at a salary in the low to mid-$90,000.00 range.

Before arriving at GWU in 1995, Dr. Feldman had earned degrees from Chicago Teachers College (B.A., 1964), DePaul University (M.A., 1969), and Miami University in Oxford, Ohio (Ph.D, 1972). He started his fund-raising experience in 1981 at Vanderbilt University where he was Director of Development in the School of Engineering. Later, he became Director of Development in 1983 for the College of Business Administration/School of Accounting at the University of Florida; Director of the Bayfront Center Foundation in St. Petersburg, Florida in 1985, Associate Director of Capital Support/Director of Major Gifts in 1988 at The College of William and Mary; and Director of Leadership Gifts at Hampden–Sydney College in Virginia.

Dr. Violand filed her complaint against GWU on August 6, 2001. She claimed unlawful sex discrimination and retaliation based on GWU's payment of her "comparator" (Dr. Feldman) at a grade 24 level compared to her salary at the grade 17 level (Count I); intentional infliction of emotional distress (Count II); and a violation of the District of Columbia Human Rights Act ("DCHRA") with respect to her compensation (Count III). GWU filed an answer to the complaint on August 26, 2001, responding generally to Dr. Violand's allegations, and asserting certain boilerplate affirmative defenses. Two days later, GWU filed a partial motion to dismiss Counts I and II of the complaint, contending that Counts I and III were "duplicitous" and that Count II was barred by the three-year statute of limitations pertaining to intentional infliction of emotional distress claims. Dr. Violand opposed the motion but, in an order filed on November 7, 2001, the Honorable Susan R. Winfield dismissed Count I, without prejudice, and Count II, with prejudice. Thereafter, the parties proceeded with discovery and depositions.

GWU filed a motion for summary judgment on May 8, 2002, and an amended (technical) motion on May 21, 2002, basically arguing that Dr. Violand could not meet her burden to establish a *prima facie* case of pay discrimination. The motion contained a footnote indicating, in part, that "the majority of [Dr. Violand's] allegations are also barred by the applicable one year statute of limitations under the [DCHRA]," and that "[p]rocedurally, therefore, any claim arising prior to August 6, 2000 is time barred." However, the motion included neither textual argument concerning the statute of limitations, nor citation to any applicable case law. The Honorable Mary Ellen Abrecht denied GWU's summary judgment motion in an order docketed on June 6, 2002; the order did not mention GWU's footnote pertaining to the statute of limitations. On June 12, 2002, GWU filed a "Motion for Reconsideration of its Motion for Summary Judgment." No contention concerning the statute of limitations appeared in the motion for reconsideration. Dr. Violand opposed the motion for reconsideration on June 25, 2002. On July 1, 2002, Judge Abrecht denied the motion for reconsideration, and stated that: "Summary judgment was denied because of disputed facts, especially facts concerning whether Plaintiff's fund raising work was equal to her comparator." The parties filed a joint pretrial statement on October 30, 2002. Under the section headed "Claims and/or Defenses," Dr. Violand set forth several, including: "Plaintiff was denied equal pay for equal work because of her sex in violation of the

DCHRA." GWU stated simply: "Defendant denies each and every allegation asserted by Plaintiff."

Judge Abrecht filed a pretrial order on November 7, 2002, which, in part, incorporated the parties' Pretrial Statement, specified that "[n]o other claims or defenses will be entertained at trial absent exceptionally good cause," and stated that "[t]rial briefs for new calendar judge, if filed, [were] to be filed one week before trial...." On February 24, 2003, GWU filed a Trial Brief in the Civil Actions Branch of the trial court, with a copy to the Honorable Melvin Wright. In a section titled "The Failure of the Continuing Violation Theory," GWU stated:

> At trial, it is anticipated that Plaintiff may attempt to seek back pay and related damages dating as far back as 1995, when Jack Feldman was first hired as the Director of Development for the Medical Center. Such allegations, however, clearly fall outside the applicable one year statute of limitations applicable to claims arising under the District of Columbia Human Rights Act....

GWU argued that the continuing violation theory could not be applied to this case.

The case proceeded to trial before the Honorable Herbert Dixon on March 3, 2003. In addition to Dr. Violand, the plaintiff's witnesses included Dr. Bernard Malloy, Dr. Violand's physician; Dr. Michael Worth, GWU's Vice President for Development and Alumni Affairs from 1983 to 2001; Dr. Feldman; Dr. John Franklin Williams, who served as GWU's Associate Vice President for Development and Alumni Relations and later Vice President for Health Affairs and Dean of the School of Medicine and Health Sciences prior to becoming Provost in January 2003; Dr. Grossman by deposition; and Dr. Joseph L. Tryon, an economist.

Among other duties, Dr. Worth reviewed and discussed contact reports prepared by development officers. He explained the "vocabulary of fund-raising" as used by GWU, such as "prospect" (someone believed to have "the capacity and some inclination to make a gift in the future"), "cultivation" ("developing a relationship with a potential donor"), "solicitation" ("asking for the gift at some eventual point"), and "stewardship" ("maintaining a relationship with the donor after the gift"). In addition, he stated that during the period from 1996 to 2001, Dr. Feldman was responsible for 354 prospects and Dr. Violand for 555 prospects.

Dr. Williams, who had responsibility for the development office at the Medical Center, testified that the mission of the development office in the Medical Center was "to develop prospects for fund raising, philanthropic reasons, to have relationships with the alumni, recent graduates, current parents of students to raise money for the medical center." Dr. Williams was aware that Dr. Violand had filed a grievance concerning alleged salary inequities, but he did not "have any direct knowledge as to monies being brought in by Dr. Violand versus money being brought in by Dr. Feldman." He defined a "major gift" as "a hundred thousand dollars or more," stated that he did "not believe that [Dr. Violand] was authorized" "to travel to solicit major gifts for the university," but acknowledged that he had never "investigated that matter." He claimed that "to [his] best knowledge, [Dr. Violand] was not tasked with major gift fund-raising." Dr. Grossman testified "that a major gift is a half million dollars or more," but he was aware of no document that required Dr. Feldman to solicit gifts of $500,000.00 or more. When asked to indicate Dr. Feldman's duties and responsibilities, Dr. Grossman said: "He identified several individuals ..., with the assistance of the infrastructure of the Development office [at GWU]"; in addition, "he developed re-

lationships with them by making periodic contact with them by telephone, in person, or corresponding in writing and so forth ["cultivation"]." He "got them to the point where ... they and he believed they were prepared to enter into a substantive conversation about making a gift of a substantive amount to the medical center ... [o]f $500,000 or more." On one occasion, Dr. Feldman "laid the groundwork" and both Dr. Feldman and Dr. Grossman went to Florida where Dr. Grossman asked the person for "20 million dollars" but did not get "a cent."

Dr. Tryon "prepare[d] an analysis of Dr. Violand's ... projected economic losses with [GWU]. He compared the salary and fringe benefit information for Dr. Feldman and Dr. Violand from August 15, 1996 to the year 2001, and then based upon assumptions about what Dr. Feldman's pay rate would have been thereafter to the week of Dr. Tryon's testimony, calculated "that the total difference would be $280,955" in "back pay." He also provided testimony regarding the present value of "front pay projected losses"—"$548,234."

Before the presentation of GWU's case, the university moved to dismiss Dr. Violand's case as a matter of law, in part, because (1) "in the area of skill," Dr. Feldman "possessed more experience in the area of major gift development than [ ] did [Ms. Violand]" and earned his Ph.D in 1972 whereas Ms. Violand received her EE.D in 1998; (2) "in terms of effort," Dr. Feldman actually "solicited somewhere around 500 major gifts," but "he only inputted into the system approximately 2[00] to 300" of those gifts; and (3) with respect to "responsibility," Dr. Feldman "was hired not only to raise major gifts, but to manage." GWU also declared "that Dr. Violand's claim for back pay ought to be limited to one year from the date she filed her complaint," or August of 2000, because the case could not be considered a "continuing violation." Dr. Violand opposed the motion, in part, (1) pointing to her exhibits showing that she was "performing the functions of a major gift officer," in terms of effort, in the same manner as Dr. Feldman; (2) asserting that the evidence demonstrated "that the skill by which Dr. Violand performed her function as a major gift officer for the university was equal to if not superior to that of Dr. Feldman"; (3) arguing that in terms of "responsibility," both Dr. Feldman and Dr. Violand "were reporting to the same supervisors, ... [and] were working under the same working condition"; (4) maintaining that based on the documentary evidence—the contact sheets—"the jury can decide whether or not the question of the solicitation, the cultivation, cultivations followed up, the commitments received, and other development moves that were made by both Dr. Feldman and Dr. Violand were equal in the performance of the work that [ ] was expected of them by the university." She also insisted that in an unequal pay case such as this—where she is performing the same work as a male but receiving a lower salary—the issuance of each pay check results in pay discrimination on the basis of gender. At the trial court's request, GWU proffered the evidence it would present during the defense case. The trial court denied GWU's motion to dismiss Ms. Violand's complaint as a matter of law. But, the court noted "some really problematic issues in the plaintiff's case," and stated "[I]f this case has been made at all, ... it will be [on] the paperwork...."

GWU presented two witnesses, Patricia Tanner, Manager, Staffing and Compensation Services, and Beverly K. Bond, GWU's Vice President for Advancement. Ms. Tanner asserted that during his employment with GWU, Dr. Feldman held an ungraded position which was higher than a grade 24. His first title was Director of Medical Center Development, which was

changed on November 30, 1997, to Director of Medical Center Development for Major Gifts. In response to a question on cross-examination as to "[w]hat type of analysis [was] undertake[n] before the change in title was made ...," Ms. Tanner did not "recall all the specifics of this particular action." Ms. Bond assumed her position at GWU on January 1, 2002 (a position previously held by Dr. Worth), and had a meeting with Dr. Violand on February 3, 2003, the purpose of which "was to discuss the future staffing plans for Medical Advancement." She maintained that Dr. Violand "said that she had assigned prospects to herself in order to reserve them for the medical center in order to make sure those prospects were not lost or forgotten, and many of them were people she had not worked with herself. ..." On cross-examination Ms. Bond, in responding to an inquiry, acknowledged that she "had heard that [Dr. Violand] had a legal issue with the university," but that she "did not know any more details about it."

At the close of GWU's case, the trial court denied the university's renewed motion to dismiss Dr. Violand's complaint as a matter of law. And, during discussions with counsel about certain legal issues, GWU insisted that any back pay award should be limited to the period August 6, 2000 to May 1, 2001, the date on which Dr. Feldman left his position at the Medical Center. Judge Dixon asked whether this was not "an issue that should have been resolved before the case g[o]t to him." Counsel for GWU agreed that it should have been resolved earlier but it was not, even though GWU briefed the issue. Counsel for Ms. Violand asserted that a prior judge had rejected GWU's continuing violation argument in denying summary judgment. At the conclusion of legal discussions, the trial court ruled that issues relating to "front or future pay," "punitive damages," and "compensatory damages," would not be submitted to the jury.

Following the trial court's final instructions to the jury on March 7, 2003, to which there were no objections, the parties presented closing arguments. The jury retired to deliberate just before noon. Prior to the end of the day, the jury reached a verdict. The jury verdict form, to which there had been no objection, posed three questions. First, "[o]n plaintiff's claim that she and Jack Feldman performed substantially equal work for jobs requiring substantially equal skill, effort, and responsibilities," does the jury find in favor of the plaintiff or the defendant? The jury responded in favor of the plaintiff. Second, "[i]f the jury's verdict is for plaintiff, [ ][t]he period of time for which plaintiff is entitled to back pay is [ ][t]hrough date of this Judgment [or][u]ntil the date when Jack Feldman was no longer employed in the Medical Center Development Office." The jury answered "[t]hrough the present date." Third, "[w]hat amount does the jury award for back pay?" The jury replied, "$280,955."

GWU filed a post-trial motion for judgment as a matter of law, new trial and/or remittitur. Judge Dixon denied the motion, stating in part:

The jury concluded here that plaintiff showed sufficient evidence of unequal pay under the DC Human Rights Act. This member of the court concludes that there was sufficient evidence upon which the jury could conclude that plaintiff performed comparable workplace duties, which required coequal skills, efforts, responsibilities, and were performed under similar working conditions as those of her comparator, Dr. Jack Feldman. Accordingly, the court cannot say as a matter of law that the jury's verdict was plainly wrong or that a reasonable jury

could not reach the same conclusions as the jury herein.

. . . .

Both plaintiff and Dr. Feldman performed similar tasks for the purpose of raising money for the University, met periodically with the Vice President for Development and recorded comparable fund[-]raising activities in their summary reports. Plaintiff established a pay disparity for the period between 1996 and 2001 by introducing evidence from the University's computer system of similarities between her employment duties and Dr. Feldman's. Both plaintiff and Dr. Feldman were responsible for the University's fund[-]raising. The jury determined that defendant violated the DCHRA by providing unequal pay for equal work, and this court concludes that a rational fact finder could determine, under the circumstances of this case, that defendant's actions were discriminatory.

Relying on legal principles from our case law, the trial court also determined that there was "no basis for a new trial or remittitur." GWU filed a timely appeal.

## ANALYSIS

### The Statute of Limitations Issue

We begin with the statute of limitations issue. GWU contends in its main brief that "[e]ven if this [c]ourt were to conclude that [Dr.] Violand established an equal pay violation, the majority of the jury's award should be vacated because it is based on claims that are barred by the applicable one-year statute of limitations set forth in the [DCHRA]"; hence, "[t]he one-year statute of limitations bars all of [Dr.] Violand's claims and damages arising prior to August 6, 2000." They assert that Dr. Violand's "untimely claims are not saved by the 'continuing violation' doctrine" because an allegation of unequal pay involves a discrete discriminatory act and such acts

are barred if they are not filed within the statute of limitations. Dr. Violand responds that her claim for back pay, based on unequal pay because of sex discrimination, "is not barred by the one-year statute of limitations of the [DCHRA], and is timely under the 'continuing violation theory.'"

Because the Supreme Court granted certiorari in a Title VII equal pay case five months after the oral argument in this case, and issued its opinion in *Ledbetter v. Goodyear Tire & Rubber Co.,* — U.S. ——, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), on May 29, 2007, we asked the parties to file supplemental briefs "discussing *only* the impact, if any, of *Ledbetter* on the disposition of this case." In its supplemental brief, GWU argues that all of Dr. Violand's claims are barred under *Ledbetter,* but that "at a minimum, the [DCHRA's] one-year statute of limitations bars [Dr.] Violand's claims based on allegedly unequal pay she received prior to August 6, 2000, and requires vacating the jury's award of back pay attributable to allegedly unequal pay she received between that date and August of 1996, when she contends she performed the same work as her alleged male comparator." Dr. Violand argues that *Ledbetter* is inapplicable because her "employment discrimination claim of unequal pay for equal work proceeded, and was tried, under the [DCHRA] based on the instruction and guidance of the [federal] Equal Pay Act." In addition, she claims that GWU "waived the statute of limitations defenses . . . ."

In *Ledbetter, supra,* a case involving a pay discrimination claim based on sex under Title VII of the Civil Rights Act of 1964, the Court declared that "[b]ecause a pay-setting decision is a 'discrete act,' it follows that the period for filing an EEOC charge begins when the act occurs." *Id.* at 2165. Consequently, Ms. Ledbetter "should have filed an EEOC charge within

180 days after each allegedly discriminatory pay decision was made and communicated to her. She did not do so, and the paychecks that were issued to her during the 180 days prior to the filing of her EEOC charge do not provide a basis for overcoming that prior failure." *Id.* at 2169. Ms. Ledbetter did "not assert that the relevant [employer] decisionmakers acted with actual discriminatory intent either when they issued [their] checks during the EEOC charging period or when they denied her a raise in 1998." *Id.* at 2167. Thus, "[b]ecause [Ms.] Ledbetter did not file timely EEOC charges relating to her employer's discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time." *Id.* at 2174.

■ *Ledbetter* does not control the outcome of GWU's appeal. Unlike the case before us, Ms. Ledbetter's former employer "contended ... throughout the litigation, that [her] pay claim ... was barred by Title VII's requirement that the conduct complained of in a Title VII action must have been the focus of an EEOC charge filed within 180 days of the occurrence of the conduct." *Ledbetter v. Goodyear Tire & Rubber Co.,* 421 F.3d 1169, 1176 (11th Cir.2005). In contrast, although GWU raised a boilerplate statute of limitations affirmative defense in its answer to Dr. Violand's complaint ("Some or all of the claims set forth in the Complaint are barred by the applicable statute of limitations ...."), it mentioned the statute of limitations in its motion to dismiss only with respect to the intentional infliction of emotional distress count. And, although

GWU included a footnote on the statute of limitations in its motion for summary judgment, it made no textual argument on that subject and cited no applicable case law. Moreover, after the trial court denied its motion for summary judgment, with no mention of the statute of limitations, GWU lodged a motion for reconsideration. That motion contained neither argument nor a footnote on the statute of limitations. and its relation to Dr. Violand's pay discrimination claim. Significantly, GWU did not assert the statute of limitations as an affirmative defense in the parties' joint pretrial statement.[3] The university's initial argument concerning the statute of limitations and the continuing violation theory first appeared in a trial brief, filed one week before trial. GWU also invoked this trial brief argument in a mid-trial motion to dismiss as a matter of law, and later during its renewed motion to dismiss. At that time the trial judge suggested that the issue should have been resolved before the case reached him for trial. Under these circumstances, we conclude that GWU waived or abandoned the statute of limitations defense.

■ There is a distinction between waiving or abandoning an affirmative defense and forfeiture of the defense: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (citations omitted). Here, by not asserting the statute of limi-

---

**3.** The Joint Pretrial Statement is signed by counsel for the plaintiff and the defendant. Under the heading "Claims and/or Defenses," the plaintiff identified seven (7) claims, and for defenses, the defendant made one statement: "Defendant denies each and every allegation asserted by Plaintiff." The Pretrial Order issued by the trial judge after a Novem-

ber 6, 2002, Pretrial Conference with the parties specified, in part: "Except as modified by this Order, the parties' Joint Pretrial Statement is incorporated in this Pretrial Order. **No other claims or defenses will be entertained at trial absent exceptionally good cause.**" (Emphasis in original).

tations as an affirmative defense in its pretrial statement (or even in its motion for reconsideration of its motion for summary judgment), GWU waived or abandoned that affirmative defense. Attempting to assert it in a continuing violation argument in its trial brief, and again during mid-trial, came too late to avoid waiver or abandonment, especially since the trial court's pretrial order of November 7, 2002, incorporating the parties' joint pretrial order, declared in essence that any defense not appearing in the joint pretrial statement could not be raised at trial "absent exceptionally good cause." GWU did not offer an "exceptionally good cause" in its trial brief, nor in its mid-trial motion. Had the trial court entertained GWU's very late, mid-trial assertion of a statute of limitations defense with respect to the pay discrimination claim, Dr. Violand undoubtedly would have been prejudiced.

That *Ledbetter* does not control the outcome of GWU's appeal also is clear from another Supreme Court decision. In *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995), the Supreme Court reiterated its legal principle governing retroactive application of its decisions in civil cases: "[W]hen (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as 'retroactive,' applying it, for example, to all pending cases, whether or not those cases involve predecision events." *Id.* at 752, 115 S.Ct. 1745 (citing *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993)). Our decision in *Davis v. Moore*, 772 A.2d 204 (D.C.2001), applied the Supreme Court's "'firm rule of retroactivity,'" *id.* at 230 (citation omitted) in a criminal case.

*Reynoldsville Casket*, which *Davis* cited, recognized that there are certain limited exceptions to this firm rule of retroactivity, and courts "will find instances where that new rule, for well-established legal reasons, does not determine the outcome of the case." 514 U.S. at 758–59, 115 S.Ct. 1745. "Thus, a court may find (1) an alternative way of curing the constitutional violation, or (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) as in the law of qualified immunity, a well-established general legal rule that trumps the new rule of law, which general rule reflects *both* reliance interests and other significant policy justifications, or (4) a principle of law . . . that limits the principle of retroactivity itself." *Id.* at 759, 115 S.Ct. 1745; *see also Davis, supra,* 772 A.2d at 230 (quoting *Reynoldsville Casket, supra,* 514 U.S. at 759, 115 S.Ct. 1745). The exception that applies in this case is the second one, and we conclude that the legal principle governing waiver or abandonment of an affirmative defense constitutes "a previously existing, independent legal basis (having nothing to do with retroactivity) for [declaring that *Ledbetter* does not control the outcome of the case before us.]." [4] *Reynoldsville Casket, supra,* 514 U.S. at 759, 115 S.Ct. 1745.

### The Merits of the Pay Discrimination Claim

GWU asserts that "[r]eversal is required because *no evidence exists upon which a reasonable jury could find that* [GWU] committed an equal pay violation," and the university further claims that Dr. Violand did not satisfy her "burden to demonstrate that [GWU] paid different wages to an employee of the opposite sex for work on jobs the performance of which required

---

4. Given our conclusion, we find it unnecessary to decide whether *Ledbetter* would be applicable to this DCHRA case had the defendant properly asserted the statute of limitations as an affirmative defense.

substantially equal skill, effort, and responsibility, and which are performed under similar working conditions." Furthermore, GWU contends that "[r]eversal is also required because ... there is no equal pay violation as a matter of law because any [pay] disparity is based on a 'factor other than sex.'" Citing to the evidentiary record, including the contact reports admitted into evidence, Dr. Violand in essence argues that the jury correctly found that she introduced sufficient evidence to satisfy her burden of proof and the trial court properly denied GWU's post-verdict motion.

 We review denials of motions for judgment as a matter of law *de novo. See Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 945 (D.C.2003). "Judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the opposing party, there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Id.* (quoting *Railan v. Katyal*, 766 A.2d 998, 1006 (D.C.2001) (quoting Super. Ct. Civ. R. 50)) (internal quotation marks omitted). "In our review, we must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting [our] judgment for that of the [ ] jury." *Id.* (quoting *Alliegro v. ACandS Inc.*, 691 A.2d 102, 105 (D.C.1997) (citations and internal quotation marks omitted)). Our standard for reviewing denials of new trial motions is abuse of discretion. *See Lewis v. Voss*, 770 A.2d 996, 1002 (D.C.2001). "A trial court has 'broad latitude' in ruling on a motion for a new trial." *Faggins v. Fischer*, 853 A.2d 132, 140 (D.C.2004) (citing *United Mine Workers of Am. v. Moore*, 717 A.2d 332, 337 (D.C. 1998)) (other citation omitted). "To grant a motion for a new trial, the trial court must find that the verdict is against the weight of the evidence, or that there would be a miscarriage of justice if the verdict is allowed to stand." *Moore, supra*, 717 A.2d

at 337 (citing *Gebremdhin v. Avis Rent–A–Car Sys., Inc.*, 689 A.2d 1202, 1204 (D.C. 1997)). Our review of the denial of a request for remittitur is governed by an abuse of discretion standard. *See Lacy v. District of Columbia*, 408 A.2d 985, 988 (D.C.1979).

 We previously articulated the legal principles applicable to a pay discrimination case under the DCHRA. "A plaintiff who alleges that she was unlawfully paid less than a man must establish that the employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Howard Univ. v. Best*, 484 A.2d 958, 984 (D.C.1984) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)) (other citations and internal quotation marks omitted). "The phrase equal work does not require that the jobs be identical, but only that they be substantially equal." *Id.* (other citations and internal quotation marks omitted). "Skill includes consideration of such factors as experience, training, education and ability." *Id.* (citations omitted). "Responsibility involves the degree of accountability required in the performance of the job; the controlling factor is not job title but job content—the actual duties that the respective employees are called upon to perform." *Id.* (citations omitted).

 "In an employment discrimination case where disparate treatment is alleged, the employee carries the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Greater Washington Bus. Ctr. v. D.C. Comm'n on Human Rights*, 454 A.2d 1333, 1338 (D.C.1982) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207

(1981)) (other citations and internal quotation marks omitted). "That burden is not onerous and, once met, creates a presumption that the employer unlawfully discriminated against the employee." *Id.* (citation omitted). "The burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the action." *Id.* (citations omitted). "[T]he defendant need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (quoting *Burdine, supra,* 450 U.S. at 256–60, 101 S.Ct. 1089) (internal quotation marks omitted). Employers may defend against a claim of discriminatory pay differential by showing that "such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Lawrence v. CNF Transp., Inc.,* 340 F.3d 486, 491 (8th Cir.) (citing 29 U.S.C. § 206 d(1)).

■■■■■■ Our *de novo* review of the voluminous record in this case[5] satisfies us that the trial court correctly resolved GWU's post-trial motion. In reaching that conclusion we are mindful of the limits imposed on an appellate court—that (1) "[we] may grant a motion for judgment as a matter of law notwithstanding the verdict only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor," *Liu v. Allen,* 894 A.2d 453, 459 n. 10 (D.C.2006) (citation omitted); and (2) "[t]he scope of appellate review [of the trial court's denial of a motion for a new trial] is especially

narrow when the trial court denied the motion, [ ] [because] the trial court's unique opportunity to consider the evidence in the context of a living trial coalesces with the deference properly given to the jury's determination of such matters of fact as the weight of the evidence." *Id.* (quoting *Oxendine v. Merrell Dow Pharms.,* 506 A.2d 1100, 1110–11 (D.C. 1986)) (internal quotation marks omitted). The trial court recognized these limiting legal principles in disposing of GWU's post-trial motion and determined, based on its own review of the evidence, that the jury verdict could not be reversed under the applicable standard, that is, as the trial court put it: "a rational fact finder could determine, under the circumstances of this case, that defendant's actions were discriminatory."

Yet, GWU presses two additional points which do not persuade us. First, the university reiterates that it should have prevailed because it demonstrated that "any pay disparity that exists in this case is attributable to a factor other than sex," that is, Dr. Feldman's "significantly greater experience as a major gift officer." The trial court properly instructed the jury concerning GWU's defense of "a factor other than sex" and the jury rejected that defense, which was presented mainly through the testimony and resume of Dr. Feldman. On this record we see no reason to disturb the jury's determination. Second, GWU attacks the jury's award of back pay damages, claiming that the testimony of Dr. Violand's expert (Dr. Tryon) "is largely speculative, unreliable, and lacks foundation"; and asserting that damages awarded for "the period of May of 2001 through the date of verdict [ ] should

---

5. The record includes three volumes of official Superior Court pleadings (not including all of the discovery and deposition documents), a seven-volume joint appendix filed by the parties in this case, including numerous computer-generated contact reports for Dr. Violand and Dr. Feldman, a supplemental appendix containing trial exhibits and other documents, and official transcripts from the five-day trial.

be stricken because [Dr.] Violand made no claim that any male was paid more than she was for the same work" after Dr. Feldman left the Medical Center in April 2001. The short answer to these points is that it was within the province of the jury to weigh the evidence of Dr. Violand's expert and to decide whether to accept his assumptions and calculation of back pay; and after the trial court discussed proposed jury instructions (as well as the verdict form) with both counsel and carefully instructed the jury on damages (telling them, for example, they could award back pay but not front pay and that they "should be guided by dispassionate common sense" and "reasonable inferences from the facts in evidence"), neither counsel raised any objection. Hence, on the record in this case, we see no reason to disturb the jury's verdict.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*