*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-152

SHINOK PARK, APPELLANT,

V.

MILAN N. BRAHMBHATT
and
PETER C. HANSEN, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-3178-17)

(Hon. Michael L. Rankin, Trial Judge)

(Submitted September 30, 2019    Decided August 13, 2020)

*Bruce M. Bender* was on the brief for appellant.

*Peter C. Hansen*, pro se, and *J. Michael King* were on the brief for appellees.

Before GLICKMAN, FISHER, and THOMPSON, *Associate Judges*.

GLICKMAN, *Associate Judge*: Appellant Shinok Park worked under appellee Milan Brahmbhatt at the World Bank (the Bank). Ms. Park reported Mr. Brahmbhatt to the Bank's Office of Ethics and Business Conduct (the EBC), alleging that he sexually assaulted and harassed her. The EBC investigated her

allegations and, when doing so, afforded Mr. Brahmbhatt multiple opportunities to respond. Mr. Brahmbhatt retained appellee Peter Hansen as counsel during the Bank's investigation. Through counsel, Mr. Brahmbhatt submitted two memoranda to the EBC, in which he claimed he had a consensual sexual relationship with Ms. Park and accused her of blackmailing and extorting him for employment opportunities at the Bank. According to Ms. Park, the memoranda also implied that she was a prostitute. The EBC sent a report to the Bank's Vice President of Human Resources, attaching the two memoranda. In the report, the EBC recommended that the Vice President sanction Mr. Brahmbhatt for violating Bank rules by failing to resolve a *de facto* conflict of interest, but not to sanction him for sexual assault or harassment. The Vice President adopted the EBC's recommendation. Mr. Brahmbhatt appealed his sanction to the World Bank Administrative Tribunal (the WBAT), which affirmed the Vice President's decision.

Ms. Park later was terminated from her employment at the Bank. She sued Mr. Brahmbhatt and Mr. Hansen in Superior Court for defamation, claiming the two memoranda they submitted to the EBC defamed her and resulted in her

termination.[1]    The trial court granted summary judgment[2] in favor of Mr. Brahmbhatt and Mr. Hansen, holding that they were entitled to absolute immunity based on the judicial-proceedings privilege for all statements they made in connection with the Bank's investigation.  Ms. Park appeals that holding, arguing that the judicial-proceedings privilege is inapplicable.  We disagree and affirm.

---

[1]  Ms. Park learned of the two memoranda, not through the Bank, but through discovery in a parallel action against Mr. Brahmbhatt in Superior Court for sexual assault and harassment.  The Bank's investigative records were confidential and not released to Ms. Park.

[2]  We treat the trial court's ruling as granting summary judgment.  The trial court's order is captioned as an order granting a motion to dismiss, but the court considered exhibits and evidence not incorporated in Ms. Park's complaint.  *See Clay v. Hanson*, 536 A.2d 1097, 1100 n.3 (D.C. 1988) ("Because the parties presented materials beyond the pleadings which were not excluded by the motions judge, Hanson's motion to dismiss under Super. Ct. Civ. R. 12(b)(6) must be treated as one for summary judgment, and this court must apply the same standards as the trial court in reviewing a motion for summary judgment." (internal citations omitted)).  The trial court, at a hearing where the parties were present, indicated that it would treat the motion to dismiss as a "Rule 56 motion," and no party objected to that treatment.

## I.[3]

The judicial-proceedings privilege "affords an attorney [and his or her client] absolute immunity from actions in defamation for communications related to judicial proceedings."[4] "For the absolute immunity of the privilege to apply," we have said, "two requirements must be satisfied: (1) the statement must have been made in the course of or preliminary to a judicial proceeding; and (2) the statement must be related in some way to the underlying proceeding."[5] We have applied the privilege, not only to formal judicial proceedings, but also to "quasi-judicial proceedings conducted by administrative bodies"[6] and by private arbitral

---

[3] We review the trial court's grant of summary judgment *de novo* and apply the same standard as that of the trial court, asking whether the movant established that there is no genuine dispute of a material fact and that he is entitled to judgment as a matter of law. *Hamilton v. Howard Univ.*, 960 A.2d 308, 313 (D.C. 2008). For there to be a genuine dispute of a material fact, the evidence must show that a reasonable jury could find that fact in favor of the nonmoving party. *Sibley v. St. Albans Sch.*, 134 A.3d 789, 809 (D.C. 2016). Neither party here disputes a fact material to the judicial-proceedings privilege. This case, therefore, presents a pure question of law.

[4] *Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988); *see also* Restatement (Second) of Torts § 587 (1997) (extending the privilege to "[a] party to a private litigation").

[5] *Arneja*, 541 A.2d at 623.

[6] *Mazanderan v. McGranery*, 490 A.2d 180, 181-82 (D.C. 1984) (Hacker's License Appeal Board, an administrative body that heard complaints about taxi drivers); *see also Arneja*, 541 A.2d at 623 (District of Columbia Rental

*(continued…)*

tribunals.[7] And we have applied the privilege to statements made preliminary to judicial proceedings, so long as "an attorney [made the statements] while performing his function as such,"[8] there is "a reasonable nexus between the publication in question and the litigation under consideration,"[9] and the statements had a genuine "relationship to potential litigation" and were not made as a "mere afterthought or [with a] sham rationale."[10]

Ms. Park argues that neither the EBC investigation nor the WBAT proceedings were judicial or quasi-judicial proceedings and that, even if the WBAT is a quasi-judicial body, Mr. Brahmbhatt and Mr. Hansen submitted the memoranda to the EBC, not the WBAT. We disagree and conclude that the WBAT is a quasi-judicial body; that Mr. Hansen, acting as an attorney on behalf of

---

*(…continued)*
Accommodations Office, which heard claims for exemptions from the District's rent stabilization program).

[7] *Sturdivant v. Seaboard Service System, Ltd.*, 459 A.2d 1058, 1060 (D.C. 1983).

[8] *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 341 (D.C. 2001) (quoting Restatement (Second) of Torts § 586 cmt. c (1997)), *overruled on other grounds by McNair Builders, Inc. v. Taylor*, 3 A.3d 1132 (D.C. 2010).

[9] *Id.* at 342.

[10] *Id.*

Mr. Brahmbhatt, submitted the memoranda to the EBC preliminary to WBAT proceedings; and that the alleged defamatory statements were related to WBAT proceedings. We address each of those conclusions in turn.[11]

## A.

As Ms. Park points out, we have not fashioned a "precise definition of 'quasi-judicial.'" We note, too, that other jurisdictions have not invariably applied the privilege. It has been extended to "administrative proceedings that are adversar[ial] and quasi-judicial, that is, when they apply law to facts and are subject to judicial review," "to private quasi-judicial proceedings such as a university's formal investigation of charges against its president, or an investigation of teachers charged with misdeeds or incompetence," and "to

---

[11] We do not address whether the EBC, an investigative arm of the World Bank, is itself a quasi-judicial body. The trial court did not analyze this precise question as to the EBC and the WBAT individually; it looked to the "structure" and "administrative apparatus" of the Bank to find that "[t]he administrative process, seen as a whole, is clearly quasi-judicial." Although we agree that the administrative apparatus and structure of the Bank are relevant, it would have been preferable to make a specific determination as to whether each body was a quasi-judicial tribunal. Such a determination can make a difference where, for example, a party submits a defamatory statement to an investigatory body (like the EBC), and invokes future proceedings before a quasi-judicial body (like the WBAT) as a sham rationale for the submission. We do not think the present case presents such a situation, however.

statements made as part of a private, contractual arbitration proceeding, at least where the arbitration procedures offer some substantial comparison to judicial safeguards."[12]

From the lack of clarity in this area, Ms. Park asks us to define a "quasi-judicial" proceeding as a proceeding that has "certain judicial hallmarks." And when making that assessment, Ms. Park asks us to employ as factors a non-exhaustive list of procedures used by other jurisdictions. It follows, according to Ms. Park, that because the Bank's "process . . . was nearly entirely one-sided[,] as Ms. Park was not privy to the happenings of the investigation or the evidence submitted by Mr. Brahmbhatt," the adjudicatory apparatus of the Bank is not quasi-judicial.

But in every case where we have extended the privilege, we relied on the policy rationales underlying it, not simply a set of procedures employed by the tribunal under consideration for the privilege; its grant of absolute immunity, after all, finds its roots in public policy. The privilege exists to "secur[e] to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their

---

[12] 3 Dan B. Dobbs, et al., *The Law of Torts* [hereinafter, "Dobbs"], § 539, p. 240 (2d ed. 2011) (footnotes omitted) (collecting cases).

clients,"[13] and to "assure all [others] concerned that they can speak truly,"[14] "without fear of answering in a civil action for defamation."[15] For example, when we extended the privilege to the Rental Accommodations Office, we reasoned, "[t]he shield of absolute immunity extends to adversarial proceedings conducted before administrative agencies 'because it enables participants to state and support their positions without instilling a fear of retaliation, *i.e.*, an action for damages.'"[16] And when we extended the privilege to arbitration proceedings, we said, "[t]o deny an absolute privilege to witnesses, parties, arbiters and counsel who participate in these proceedings, would chill" parties from entering arbitration.[17] Finally, when we extended the privilege to the Hacker's License Appeal Board, we cited cases that relied on the policy rationales underlying the privilege,[18] including a Second Circuit case that said:

---

[13] Restatement (Second) of Torts § 586 cmt. a (1997).

[14] Dobbs, *supra* footnote 12, § 539, p. 242.

[15] 2 Fowler V. Harper, et al., *Harper, James and Gray on Torts*, § 5.22, p. 227 (3d ed. 2006).

[16] 541 A.2d at 623 (quoting *Sturdivant*, 459 A.2d at 1060).

[17] *Sturdivant*, 459 A.2d at 1060.

[18] *Mazanderan*, 490 A.2d at 182 (citing *Sturdivant*, 459 A.2d 1058; *Bleecker v. Drury*, 149 F.2d 770 (2d Cir. 1945)).

> Privilege is founded on public policy. Fearless administration of justice requires, among other things, that an attorney have the privilege of representing his client's interests, without the constant menace of claims for libel. Here the [New York Industrial Board] conducts hearings in which the admissibility of evidence is ruled upon by the member or officer presiding. It limits the rights of persons to appear before it and in substance observes a procedure akin to that of the courts of record of New York. It makes full and conclusive determinations of both questions of fact and of law, and an appeal may be taken from its determination to an appellate court. The adequate representation of a client and the full presentation of pertinent facts are just as important in this proceeding as in those before any other tribunal. We see no reason why statements made to the Board should not be held to be privileged to the same extent as those made in connection with any judicial proceeding.[19]

To be sure, the Second Circuit described the specific procedures of the New York Industrial Board, which the Second Circuit held was entitled to the privilege. But it linked that description to its broader discussion of the policy reasons supporting extension of the privilege. A given tribunal's procedures are relevant to whether extending the privilege comports with the underlying policy of the privilege. As the D.C. Circuit has observed, we have found quasi-judicial proceedings where a proceeding has "all of the trappings of an adjudicatory

---

[19] *Bleecker*, 149 F.2d at 771-72.

tribunal,"[20] or where a proceeding "is designed to adjust the rights or liabilities of the parties before it and calls for an exercise of guided discretion by an impartial decisionmaker."[21] But that is merely descriptive of tribunals we have found to be "quasi-judicial"; there is no fixed standard for quasi-judicial, nor is there a telltale sign for one, such as whether the victim of defamation had an adequate opportunity to participate in the proceeding and to respond, as Ms. Park would have us adopt.

The ultimate inquiry is, and has always been, whether the policy rationales for the privilege support its extension. And with regard to the WBAT, we believe that they do, for two related reasons.

*First*, it was an all-or-nothing situation for Mr. Brahmbhatt at the Bank. Because the Bank is immune from judicial scrutiny in United States courts, his only redress for adverse employment action was through the Bank's internal adjudicatory apparatus. In *Mendaro v. World Bank*,[22] Susana Mendaro sued the Bank under Title VII of the Civil Rights Act of 1964, "claim[ing] that during her

---

[20] *White v. Fraternal Order of Police*, 909 F.2d 512, 524 (D.C. Cir. 1990).

[21] *Jones v. Mirgon*, No. 88-7001, 1989 WL 105498, at *2 (D.C. Cir. Aug. 31, 1989).

[22] 717 F.2d 610 (D.C. Cir. 1983).

term of employment she was the victim of a pattern of sexual harassment and discrimination by other Bank employees," including supervisory staff.[23] The D.C. Circuit dismissed her complaint, holding that the Bank was entitled to immunity under § 2(b) of the International Organizations Immunities Act (the IOIA)[24] for all issues "arising out of internal administrative grievances."[25] Based on *Mendaro*, it was vital for Mr. Brahmbhatt to mount a defense against the accusations Ms. Park launched against him, as it would be vital for any other employee facing possible adverse employment action at the Bank. The judicial-proceedings privilege was erected, in part, to avoid putting someone, like Mr. Brahmbhatt, in between a rock and a hard place.

*Second*, as a result of its immunity under the IOIA, the Bank set up the WBAT to adjudicate employees' claims against it.[26] Once "a lawless environment," in that its internal procedures for workplace grievances were immune from judicial scrutiny, "[t]he Bank's creation of an administrative

---

[23] *Id.* at 612.

[24] *Id.* at 611 n.3 (citing 22 U.S.C. §§ 288-288i (1976 & Supp. V 1981)).

[25] *Id.* at 615.

[26] Robert A. Gorman, *The Development of International Employment Law: My Experience on International Administrative Tribunals at the World Bank and the Asian Development Bank*, 25 Comp. Lab. L. & Pol'y J. 423, 425 (2004).

tribunal, having the purpose of resolving employment disputes, represents a determination by the Bank that it should be held legally accountable for the decisions made by supervisors and officials in managing the Bank's workforce."[27] The WBAT is composed of independent judges who sit in panels over adversarial proceedings between the Bank and employees; exercises judicial review of Bank policies and individual employment actions; applies a standard of review that is not overly deferential to the Bank's decisions or legal arguments; applies multiple sources of law, including staff rules, contract law, and judge-made common law; is bound by jurisdictional rules, such as exhaustion requirements; and follows precedent.[28] The WBAT is designed to ensure that employees receive due process before the Bank can take adverse employment action against them, requiring the Bank to give, among other things, notice, an opportunity to respond, and a fair investigation to the subject employee.[29]

It appears that the WBAT decides cases on the pleadings, relying on the record of the Bank's investigations and employees' submissions, and does not hold

---

[27] *Id.*

[28] *Id.* at 425-40.

[29] *Id.* at 439-40.

evidentiary hearings or oral arguments.[30] But those facts do not prevent the WBAT from being considered quasi-judicial. Instead, they make it all the more important that employees subject to EBC investigations establish a record for their defense in anticipation that they later must petition the WBAT to review an adverse action taken against them. Chilling their ability to do so, as Ms. Park would have us do by allowing her defamation claim to proceed based on appellees' submissions to the EBC, would frustrate the WBAT's objectives. Just as the D.C. Circuit in *Mendaro* believed that "judicial scrutiny of [the Bank's] internal administrative affairs" would "obstruct[] . . . the Bank's purposes,"[31] we believe that scrutinizing statements made to (or here, preliminary to) the WBAT would undermine its purposes by putting employees before it under fear of a suit for defamation.[32]

---

[30] *Id.* at 442-43.

[31] *Mendaro*, 717 F.2d at 620.

[32] *See Sturdivant*, 459 A.2d at 1060 ("Clearly if parties in arbitration hearings were given less protection than those in purely judicial proceedings, a disincentive would be built into the system.").

**B.**

Finding that the WBAT is a quasi-judicial body does not end this case. Mr. Brahmbhatt and Mr. Hansen submitted the memoranda to the EBC, not the WBAT.

As we stated above, however, we have applied the judicial-proceedings privilege to statements made preliminary to judicial proceedings so long as "an attorney [made the statements] while performing his function as such,"[33] there is "a reasonable nexus between the publication in question and the litigation under consideration,"[34] and the statements had a genuine "relationship to potential litigation" and were not made as a "mere afterthought or [with a] sham rationale."[35] These requirements have been met in instances where an attorney solicited shareholders of a corporation to participate in a class action lawsuit against the corporation;[36] an attorney questioned an adversary's competency in the English language while waiting in a hearing room of the Rental Accommodations

---

[33] *Finkelstein, Thompson & Loughran*, 774 A.2d at 341 (quoting Restatement (Second) of Torts § 586 cmt. c (1997)).

[34] *Id.* at 342.

[35] *Id.*

[36] *See id.*

Office prior to commencement of a proceeding;[37] and an attorney responded to a threat of a lawsuit against the attorney's client.[38]

In this case, Mr. Hansen submitted the memoranda to the EBC on behalf of Mr. Brahmbhatt as preliminary submissions to the WBAT. First, Mr. Hansen submitted the memoranda is his capacity as an attorney. Both memoranda bore his law firm's letterhead in the top center, "LAW OFFICES OF PETER C. HANSEN, LLC," and specified that he was "[c]ounsel to Mr. Brahmbhatt." Second, the memoranda had a "reasonable nexus" to future WBAT proceedings. Both memoranda contested facts and cited WBAT case law to argue that Ms. Park's allegations did not meet the requisite standard of proof because other evidence indicated she was lying, and that the EBC's findings of fact and conclusions of "law" in its draft report were erroneous based on WBAT precedent. Third, Mr. Hansen's submissions indicate that he intended, in part, to establish a record for future WBAT proceedings; those proceedings, in other words, were not a mere afterthought. It was crucial that Mr. Hansen establish a record early on, as the WBAT historically has not heard oral arguments or held evidentiary hearings.[39]

---

[37] *See Arneja*, 541 A.2d at 623.

[38] *See McBride v. Pizza Hut*, 658 A.2d 205, 207-08 (D.C. 1995).

[39] *See* Gorman, *supra* footnote 26, at 442-43.

## C.

The judicial-proceedings privilege also requires that the alleged defamatory statements contained in the memoranda bear some relation to future WBAT proceedings. In other words, the statements must have been relevant. But they "need not [have been] relevant in the legal sense; the term is very liberally construed."[40] They need only "have enough appearance of connection with the case . . . so that a reasonable man might think them relevant."[41]

The allegedly defamatory statements in this case were relevant to future WBAT proceedings. Ms. Park claimed Mr. Brahmbhatt sexually harassed and assaulted her, and Mr. Brahmbhatt defended himself on factual grounds, specifically, that he was the victim, not Ms. Park, something that if true would certainly have aided Mr. Brahmbhatt's defense. The question is not whether Mr.

---

[40] *Mohler v. Houston*, 356 A.2d 646, 647 (D.C. 1976).

[41] *Id.* (quoting *Brown v. Shimabukuro*, 118 F.2d 17, 18 (D.C. Cir. 1941)). *See, e.g.*, *Arneja*, 541 A.2d at 622, 624 (attorney's statement that his adversary was incompetent in the English language ("You better learn your English, go to elementary school") had a sufficient relationship to the merits of a landlord-tenant dispute because "a reasonable man might construe" those statements as related to his adversary's ability to interpret the Rental Housing Act).

Hansen executed a sound or sensible argument,[42] but whether a reasonable person might construe the statements he made as relevant.

**D.**

Before we conclude, we will repeat what we cautioned in *Finkelstein*: "We would be loath to recognize an absolute immunity from a defamation action in cases such as this one if we thought that there exist 'no safeguards against abuse.'"[43]

This case does not present an opportunity to consider the extent to which the privilege applies when there exist "no safeguards against abuse." "If the specific requirements of the privilege are not satisfied, the claim of privilege will be rejected and the attorney will be exposed to liability for damages in an action by the injured party."[44]   And although the specific requirements of the privilege have been met here, "the consequent immunity from a defamation suit does not mean

---

[42] *Cf. Arneja*, 541 A.2d at 622, 624.

[43] 774 A.2d at 346 (quoting *Demopolis v. Peoples Nat'l Bank*, 796 P.2d 426, 430 (Wash. 1990)).

[44] *Id.*

that the attorney may not be sanctioned for misconduct."[45]  An overly "bumptious and unrestrained" attorney who makes defamatory statements without regard for their truth or relevance, we predict, will render service counterproductive to his client's interests and may be liable for malpractice in a given case.[46]  That attorney, too, may be subject to professional discipline.[47]

It is worth noting that the Bank seeks to account for the interests of the complainant—here, Ms. Park—by imposing a duty on the EBC, witnesses, and staff members to keep confidential all information related to an investigation of a complaint.  The WBAT, as well, sought to protect Ms. Park's identity by referring to her as "Ms. R."  Although Ms. Park claims that the statements in the memoranda were somehow leaked and led to her termination, she has offered us no evidence that leaks are a general problem at the Bank.  And we presume that the Bank does its best to honor its rules regarding confidentiality, a presumption Ms. Park has not rebutted.

---

[45]  *Id.*

[46]  *See id.* at 341 (internal quotation marks).

[47]  *See* D.C. Rules of Professional Conduct Rule 8.4(c) ("It is professional misconduct for a lawyer to . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . ."); Rule 8.4(d) ("It is professional misconduct for a lawyer to . . . [e]ngage in conduct that seriously interferes with the administration of justice . . . .").  We express no view on how these rules apply to Mr. Hansen.

**II.**

In sum, we conclude that WBAT proceedings are quasi-judicial, that Mr. Hansen submitted the two memoranda preliminary to those proceedings, and that the underlying statements were relevant to future WBAT proceedings. It follows that Mr. Hansen and Mr. Brahmbhatt are entitled to absolute immunity based on the judicial-proceedings privilege.[48] We therefore affirm.[49]

*So ordered.*

---

[48] Ms. Park asks, in the alternative, that we reverse because the trial judge ruled on the motion to dismiss more than two months after the case had been reassigned to another judge. The trial judge, according to Ms. Park, acted in violation of Civil Rule 40-I(c), which states, "[a]ll proceedings in a case after its assignment, including trial, will be scheduled and conducted by the assigned judge." But Ms. Park did not raise this argument to the trial judge who ruled on the motion. We therefore deem her argument waived. *See George Washington Univ. v. Violand*, 940 A.2d 965, 970 (D.C. 2008) ("Here, by not asserting the statute of limitations as an affirmative defense in its pretrial statement (or even in its *motion for reconsideration* of its motion for summary judgment), GWU waived or abandoned that affirmative defense." (emphasis added)).

[49] Because of our disposition in this case, we do not address other grounds of affirmance advanced by Mr. Hansen and Mr. Brahmbhatt.